**In re Adele HALKIN et al., Petitioners.**

**No. 77–1313.**

United States Court of Appeals,
District of Columbia Circuit.

Jan. 19, 1979.

As Amended Jan. 31, 1979.

Wilkey, Circuit Judge, filed dissenting opinion.

---

**43.** *Id.* at 228, 232, 450 F.2d at 689, 693.

Mark H. Lynch and John H. F. Shattuck, Washington, D. C., were on the pleadings, for petitioner.

Barbara Allen Babcock, Asst. Atty. Gen., David J. Anderson, Elizabeth Gere Whitaker, Gordon W. Daiger and Larry L. Gregg, Attys., Dept. of Justice, Washington, D. C., were on the pleadings, for respondent.

Charles P. Sifton and Taylor R. Briggs, New York City, were on the pleadings for respondent, ITT World Communications, Inc.

H. Richard Schumacher and R. Bruce Dickson, New York City, were on the pleadings, for respondent, RCA Global Communications, Inc.

Walter C. Pozen and Alvin K. Hellerstein, New York City, were on the pleadings, for respondent, Western Union International, Inc.

Before WRIGHT, Chief Judge, and BAZELON and WILKEY, Circuit Judges.

Opinion for the Court filed by BAZELON, Circuit Judge.

Dissenting opinion filed by WILKEY, Circuit Judge.

BAZELON, Circuit Judge:

On the motion of defendants in *Halkin v. Helms*, Civ. No. 75-1773 (D.D.C.), the district court entered an order on February 14, 1976 prohibiting the parties and counsel in that case from making any extra-judicial statements about information produced through discovery, and from publicly disclosing any material produced through discovery, except by making such material a part of the court record. Plaintiffs in that case now petition this court for a writ of mandamus and/or prohibition [1] vacating the district court's order.

## I. BACKGROUND

Plaintiffs in *Halkin* are a number of individuals and organizations who allege that

1. The writ of mandamus is often used by a higher court to compel certain positive actions on the part of a lower court, while the writ of prohibition is used to prevent such actions. The two writs are thus counterparts and "are often . . . used together by a higher court to bring a lower court back within its jurisdiction." *Morrow v. District of Columbia*, 135 U.S.App.D.C. 160, 165, 417 F.2d 728, 733 (1969). A petitioner need not precisely distinguish which writ he seeks. *See, e. g., In re Simons*, 247 U.S. 231, 38 S.Ct. 497, 62 L.Ed. 1094 (1918); Note, *Supervisory and Advisory Mandamus Under the All Writs Act*, 86 Harv.L.

certain government agencies, principally the Central Intelligence Agency and the National Security Agency, as well as several common carriers, conducted unlawful programs of surveillance of United States citizens who opposed the war in Vietnam or engaged in other lawful political activities. Plaintiffs seek damages and equitable relief for alleged violations of their constitutional and statutory rights. Neither plaintiffs nor defendants in *Halkin* have demanded a jury trial.

After filing their complaint, plaintiffs requested, under Fed.R.Civ.P. 34, documents relating to Operation CHAOS, the code name for the CIA's surveillance of anti-war activists. On December 30, 1976, defendants made available to plaintiffs some of these documents, constituting approximately 3000 pages. Appendix (App.) at 10. At the same time, defendants also filed a document styled "Federal Defendant George Bush's Partial Response to Plaintiffs' First Request for Production of Documents," App. at 6 -9, which indicated that the produced documents had been purged of all matter which the Government asserted would (1) impair the United States' diplomatic and foreign relations, including the CIA's relationships with foreign intelligence or security services, or (2) reveal CIA intelligence sources and methods or the investigative or intelligence activities of another United States government agency, or (3) implicate the privacy interests of third parties.[2] Defendants sought no protective order under Fed.R.Civ.P. 26(c) limiting plaintiffs' use of these documents,[3] nor was there any express or implied agreement between the parties concerning their use.

Plaintiffs' counsel, however, believed that some of these documents contained important information not previously known con-

---

Rev. 595, 595 n.1 (1973). Since the grounds for issuing the writs are virtually identical, we shall for convenience refer to petitioners' request as though it were for mandamus alone.

2. Defendant Bush's response set out a code explaining the deletions in the documents (App. 8–9):

The following numbers and letters have been inserted where deletions have been made to indicate the nature of information or words which have been withheld from disclosure to the plaintiffs. These numbers and letters denote a particular objection and the grounds therefor.

1. Words or text denoting or revealing CIA field station, bases, or components.
2. Cryptonym, sensitivity indicator, or information handling indicator.
3. Words or text identifying a CIA employee or organizational component.
4. Security classification of the document.
A. Information obtained from or about the investigative or intelligence activities of another United States Government agency.
B. Words or text identifying an intelligence or security service of a foreign government in liaison with CIA, or information obtained from such liaison relationship with CIA.
C. Irrelevant information or words identifying a non-party whose privacy interests are entitled to protection from disclosure.
D. Words or text identifying or aiding the identification of CIA foreign intelligence or counter-intelligence sources or methods.

3. Fed.R.Civ.P. 26(c) provides:

(c) Protective Orders. Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the district where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (1) that the discovery not be had; (2) that the discovery may be had only on specified terms and conditions, including a designation of the time or place; (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery; (4) that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters; (5) that discovery be conducted with no one present except persons designated by the court; (6) that a deposition after being sealed be opened only by order of the court; (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way; (8) that the parties simultaneously file specified documents or information enclosed in sealed envelopes to be opened as directed by the court.

If the motion for a protective order is denied in whole or in part, the court may, on such terms and conditions as are just, order that any party or person provide or permit discovery. The provisions of Rule 37(a)(4) apply to the award of expenses incurred in relation to the motion.

cerning the operation of CHAOS. App. at 13. On January 24, 1977, plaintiffs gave written notice that they intended to release several documents on January 31, and provided defendants with a copy of the press release by which they planned to announce the availability of the documents.[4]

4. In a letter to defendants, plaintiffs' counsel stated (App. 19 20):

It is our view that all discovered documents are available for inspection by the press and public, unless the party producing the documents moves and obtains from the court an appropriate protective order. It is further our view that attorneys and their researchers and consultants are free to alert the public and press of discovered documents, to explain the significance of such documents, and to answer any questions from the public or press regarding such documents, unless directed otherwise by a court. Such expression constitutes "a quotation from or reference to public records" which is expressly not prohibited by Local Rule 1 27(d). Particularly since this case is not being tried to a jury, we see no reasonable likelihood that the dissemination we contemplate can interfere with a fair trial. Moreover, the produced documents concern Operation CHAOS which has been a matter of intense public interest and an extended Congressional investigation. Under all the circumstances, we believe that the public should not be denied access to any additional information about Operation CHAOS which may come to light through this lawsuit.

$*$ $*$ $*$ $*$ $*$ $*$

The responsibility for applying for a protective order rests with the party producing the documents. Despite the fact that the documents were produced without such an application having been made and despite the fact that we gave ample notice over the telephone to defendants of our intention to release the documents, we are providing you with this formal notice that we intend to make the produced documents available to the public and press on January 31, 1977. We further intend to announce this availability by means of a press release, the text of which is enclosed. Counsel for the plaintiffs and their researchers and consultants will be available to answer any questions directed to them concerning the documents. Because the above-captioned case is likely to involve the production of a substantial number of documents which will be of significant interest to the public and press, your letter has given us an opportunity to consider how we will handle the public release of such documents. In the future, we will consider ourselves free to

In response, defendants moved for a protective order pursuant to Rule 26(c). Citing Local Rule 1 27(d),[5] defendants argued that public disclosure of the documents would be "prejudicial to the defendants' right to adjudication of the issues in this civil action in an uncolored and unbiased climate, includ-

release forthwith any produced documents which are not covered by a protective order. In a letter lodged in the chambers of the district court on February 9, 1977, plaintiffs' counsel stated that plaintiffs had planned to release only three documents to the press.

5. Local Rule 1 27(d) provides:

(d) *Conduct of Attorneys in Civil Cases.* A lawyer or law firm associated with a civil action shall not during its investigation or litigation make or participate in making an extrajudicial statement, other than a quotation from or reference to public records, which a reasonable person would expect to be disseminated by means of public communication if there is a reasonable likelihood that such dissemination will interfere with a fair trial and which relates to:

(1) Evidence regarding the occurrence or transaction involved.

(2) The character, credibility, or criminal record of a party, witness, or prospective witness.

(3) The performance or results of any examinations or tests or the refusal or failure of a party to submit to such.

(4) His opinion as to the merits of the claims or defenses of a party, except as required by law or administrative rule.

(5) Any other matter reasonable likely to interfere with a fair trial of the action.

Defendants also cited the Code of Professional Responsibility as amended by the District of Columbia Court of Appeals, which retains Canon 20 of the Canons of Professional Ethics "in lieu" of DR7 107(G) and (H). Canon 20 reads:

20. Newspaper Discussion of Pending Litigation.

Newspaper publications by a lawyer as to pending or anticipated litigation may interfere with a fair trial in the Courts and otherwise prejudice the due administration of justice. Generally they are to be condemned. If the extreme circumstances of a particular case justify statement to the public, it is unprofessional to make it anonymously. An *ex parte* reference to the facts should not go beyond quotation from the records and papers on file in the court; but even in extreme cases it is better to avoid any ex parte statement.

ing a fair trial." App. at 24.[6] Defendants' motion was not accompanied by any affidavits, nor was any other evidence adduced in its support.

Plaintiffs opposed defendants' motion, arguing that a protective order would lack the "good cause" required by Fed.R.Civ.P. 26(c) and would violate the First Amendment. As part of their opposition plaintiffs lodged with the district court three documents and the press statement which plaintiffs asserted they had intended to release.[7]

On February 14, 1977, the district court signed defendants' proposed order restraining the parties and their counsel from publicly disclosing information obtained through discovery. The court made no findings of fact, but stated that disclosure would be "contrary to rules applicable to the conduct of litigation before this Court and inconsistent with the obligations of parties and their counsel to further the just determination of matters within its jurisdiction."[8] Although the parties claim to have complied with this order, the New York Times somehow acquired access to these documents and, on February 22, 1977, reported on their contents. App. at 30.

Plaintiffs have petitioned this court for a writ of mandamus[9] to vacate the district court's order. Since jurisdiction to issue this extraordinary writ depends upon our evaluation of the merits of petitioners' claims, we defer discussion of the propriety of relief until after our evaluation of the substantive issues raised by this petition. *Colonial Times, Inc. v. Gasch,* 166 U.S.App. D.C. 184, 187, 509 F.2d 517, 520 (1975).

The importance of the issue presented by this case, and the relatively scant attention it has received in previous cases, requires us to consider in some depth petitioners' claim.

## II. THE FIRST AMENDMENT AND THE DISCOVERY PROCESS

In many respects, the order of February 14 is comparatively narrow. It does not prohibit comment by the news media, but only extrajudicial statements by the parties and their counsel.[10] Nor does it

6. Defendants also argued that the documents provided through discovery were not part of the public record; that plaintiffs' press release constituted a "comment on or characterization of the contents of the documents"; and that plaintiffs had failed to demonstrate any "need" for public disclosure of the documents. App. at 25–26.

7. These documents have now been filed under seal with this court.

8. The court's order stated, in full:
 Upon consideration of the federal defendants' Motion for Protective Order, plaintiffs' opposition thereto, and of plaintiffs' counsel's letter of January 24, 1977 and the proposed press release attached thereto, and it appearing to the Court that extra-judicial statements or disclosure of discovery materials by the parties, their counsel, and researchers, consultants, or other persons who may be associated with them in this civil action are contrary to rules applicable to the conduct of litigation before this Court and inconsistent with the obligations of parties and their counsel to further the just determination of matters within its jurisdiction, it is this 14th day of February, 1977,
 ORDERED that documents and information furnished during the course of discovery in this civil action shall not, unless made a part of the open Court record herein, be the subject, either directly or indirectly, of extrajudicial statements or publication by the parties or their counsel, nor shall they otherwise disclose any such information or documents except in proceedings before this Court, and it is further
 ORDERED that the prohibition against disclosure other than for purposes directly in furtherance of litigation of this civil action before this Court shall continue until modified or removed by subsequent express order of this Court.

9. *See* note 1 *supra.*

10. Although the operative portion of the order is limited to "the parties or their counsel," *see* n. 8 *supra,* the preamble refers disapprovingly to "extra-judicial statements or disclosure of discovery materials by . . . researchers, consultants, or other persons who may be associated with [the parties or their counsel] in this civil action. . . ." *Id.* In *CBS, Inc. v. Young,* 522 F.2d 234, 239 (6th Cir. 1975), the court held that an order silencing the parties' "relatives, close friends and associates" was impermissibly vague and overbroad. To the extent the order here raised doubts in the minds of the plaintiffs' "researchers," "consultants," or "associates" as to whether the order applied to them, it too had an impermissible chilling effect on persons other than the parties and their counsel.

forbid publication of information of public record, or information acquired outside the court's processes, but only publication of documents and information obtained in discovery. Even if the order is relatively narrow, however, it restrains petitioners from communicating matters of public importance for an indefinite period of time.[11] As such, it constitutes direct governmental action limiting speech and must be carefully scrutinized in light of the First Amendment.

## A. Judicial Prior Restraints

Plaintiffs characterize the order issued by the district court as a "prior restraint" of expression and argue therefore that the order, while not unconstitutional per se, nonetheless bears a "heavy presumption" against its validity. *Southeastern Promotions Ltd. v. Conrad,* 420 U.S. 546, 558, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).[12] "The presumption against prior restraints is heavier—and the degree of protection broader—than that against limits on expression imposed by criminal penalties." *Id.* at 558–59, 95 S.Ct. at 1246. Indeed, the Supreme Court has recently indicated that prior restraints "are the most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n*

*v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683 (1976).

The term "prior restraint," at common law, referred to a system of unreviewable administrative censorship or licensing.[13] But the concept has not been so confined. In a long line of cases beginning with *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), the Supreme Court has extended the meaning of prior restraints to include judicial orders having an impact analogous to administrative censorship. Among the judicial orders that have been considered prior restraints are orders restraining extrajudicial comment about a pending or anticipated trial. In *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), the Court held that an order prohibiting any publication or broadcast by the news media "strongly implicative" of an accused criminal defendant was a prior restraint, and indicated that such an order would survive constitutional scrutiny only in the most unusual circumstances.[14]

A judicial order pursuant to Rule 26(c) limiting lawyers' and parties' expression does possess many of the characteristics of an administrative licensing scheme,

---

**11.** The dissent maintains that "the order is *limited in duration,* contemplating . . . public disclosure during trial. . . . " Dis. op. at of 194 U.S.App.D.C., at 203 of 598 F.2d (emphasis in original). Similarly, the defendants aver that the order "expires of course at the conclusion of the litigation." Fed.Res.Br. at 33. Although it is reasonable to assume this is what the district court had in mind, there is no support for this in the record. By its terms, the order continues in effect "until modified or removed by subsequent express order of this Court." *See* note 8 *supra.*

**12.** *Accord, New York Times Co. v. United States,* 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); *Carroll v. President and Commissioners of Princess Anne,* 393 U.S. 175, 181, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); *Bantam Books v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

**13.** *Pittsburgh Press Co. v. Pittsburgh Comm. on Human Relations,* 413 U.S. 376, 389 -90, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973); *Near v.*

*Minnesota,* 283 U.S. 697, 713 -15, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); Emerson, *The Doctrine of Prior Restraint,* 20 Law & Contemp.Prob. 648, 650 (1955).

**14.** Under the standards laid down by the Court, the press may be restrained only when (1) pretrial publicity is likely to be so pervasive that it probably will have an effect on jurors; (2) there are no alternative methods of dealing with the problem through (a) change of venue, (b) postponement of the trial, (c) questioning jurors closely during voir dire, (d) clear instructions at trial, or (e) sequestration of the jury; and (3) the prior restraint will be effective. *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 562, 563 -64, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). As one commentator has noted, "the practical impact of the rule announced by Chief Justice Burger is to outlaw all prior restraints in fair trial/free press cases." Goodale, *The Press Ungagged: The Practical Effect on Gag Order Litigation of Nebraska Press Association v. Stuart,* 29 Stan.L.Rev. 497, 498 (1977).

the paradigmatic prior restraint.[15] At the same time, it is equally clear that such an order need not present the same dangers as many delegations of authority to an admin-

**15.** An administrative censorship scheme provides less protection for expression than a system of subsequent punishment because it permits sanctions to be imposed for failure to obtain the censor's approval, regardless of the nature of the expression. Expression may be punished in a censorship scheme upon proof of one fact—the failure to obtain prior approval. A would-be speaker thus cannot ignore the censor, for later he will be unable to defend his expression on the ground that it posed no danger and therefore the censor could not have suppressed it consistent with the First Amendment. See Poulos v. New Hampshire, 345 U.S. 395, 408–09, 73 S.Ct. 760, 97 L.Ed. 1105 (1953). In contrast, under a system of subsequent punishment, the state must show in each case that the particular expression which the state seeks to punish did in fact pose an immediate threat to an interest which the state has a right to protect. See Landmark Communications Inc. v. Virginia, 435 U.S. 829, 843–44, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978).

A judicial order barring expression may pose a threat to expression similar to that generated by a licensing scheme, through the operation of the so-called "collateral bar" rule. The collateral bar rule precludes one who violates a judicial order from raising the order's unconstitutionality (as applied in a particular case) as a defense to contempt. See, e. g., Walker v. Birmingham, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967) (sustaining conviction for violation of an ex parte injunction and upholding state court's application of collateral bar rule where injunction was not transparently invalid and petitioners failed to utilize opportunity to appeal.) But see Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945) (where authorizing statute invalid on its face, invalidity a complete defense to contempt conviction for violating injunction issued pursuant to the statute).

If the collateral bar rule applies to an order restraining expression, the would-be speaker faces a Hobson's choice: either violate the order, risking almost certain conviction for contempt, and lose the right to challenge the order's constitutionality, or alternatively, obey the order, seek review, and forfeit, at least temporarily, the very right the would-be speaker seeks to vindicate. The dilemma is particularly acute where First Amendment interests are at stake, for even a temporary restraint on expression may constitute irreparable injury. Nebraska Press Ass'n, 427 U.S. at 559, 96 S.Ct. 2791, Carroll v. President and Commissioners of Princess Anne, 393 U.S. 175, 182, 89 S.Ct. 347 (1968).

A judicial order restraining speech casts the judge in a role comparable to that of a censor. To escape the sanctions associated with violating the order, the speaker is inevitably led to clear his expression with the judge in advance, and the speaker bears the burden of proving that the expression is inoffensive. See Near v. Minnesota, 283 U.S. at 712–13, 51 S.Ct. 625; cf. Freedman v. Maryland, 380 U.S. 51, 58, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) (to avoid constitutional infirmity censor must bear burden of showing that film is unprotected.) Where the restriction is by criminal law, of course, the burden is on the state to prove that the speech did in fact pose a great danger. In Chicago Council of Lawyers v. Bauer, 522 F.2d 242, 248–49 (7th Cir. 1975), cert. denied, 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976), the Court concluded that since the collateral bar rule did not apply in a challenge to the constitutionality of the district court's standing "no comment" rules, such rules did not constitute a "prior restraint." Nonetheless, the Court did subject them to close scrutiny. See note 22, infra. We have no occasion to decide whether the collateral bar rule could constitutionally be applied in this case. Compare United States v. Ryan, 402 U.S. 530, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971), with United States v. Dickinson, 465 F.2d 496, 509-513 (5th Cir. 1972), aff'd 476 F.2d 373 (5th Cir.), cert. denied, 414 U.S. 979, 94 S.Ct. 270, 38 L.Ed.2d 223 (1973). See generally, Goodale, supra note 14 at 508–12; Barnett, The Puzzle of Prior Restraint, 29 Stan.L.Rev. 539, 551 58 (1977).

Even in the absence of the collateral bar rule, judicial orders may provide less protection for expression than a criminal statute:

1) Unlike prosecution for a violation of a statute, one who violates a judicial order may not be afforded the full safeguards of a criminal prosecution, including the right to a jury trial. See, e. g., Emerson, The Doctrine of Prior Restraint, 20 Law & Contemp.Prob. 657–658 (1955); L. Tribe, American Constitutional Law 726 n. 1 (1978).

2) While a statute poses only a "mute, impersonal threat," a judicial order singles out particular individuals, increasing both the likelihood of punishment if the order is violated, and the probability that protected speech will be chilled regardless of the defenses which may ultimately be available in subsequent proceedings. L. Tribe, American Constitutional Law 726 n. 2. It is noteworthy that, in the Pentagon Papers case, New York Times v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), the newspapers apparently were prepared to obey an injunction, but were not deterred from publishing initially by the possibility of prosecution under criminal statutes. See Kalven, The Supreme Court, 1970–Term— Foreword: Even When a Nation Is at War, 85 Harv.L.Rev. 1, 34 & n. 156 (1971); O. Fiss, Injunctions 154–155 (1972).

istrative censor,[16] nor the same threat to expression generated by other judicial orders previously condemned as prior restraints.[17]

**16.** Administrative censorship schemes often differ from orders such as those under Rule 26(c) because their proscriptions become effective prior to a judicial adversary proceeding to determine, on the merits, the constitutionality of the restraint. *Compare A Quantity of Books v. Kansas*, 378 U.S. 205, 210, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964) *and Marcus v. Search Warrant*, 367 U.S. 717, 734 38, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961) (seizure of allegedly obscene books before adversary determination of their obscenity impermissible) *with Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 443, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957) (determination of obscenity under "essential procedural safeguards") *and Pittsburgh Press Co. v. Pittsburgh Comm. on Human Relations*, 413 U.S. 376, 390, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973) (no interim relief granted, so order not in effect before final determination that advertising policy was unprotected). *Cf. Freedman v. Maryland*, 380 U.S. at 58, 85 S.Ct. 734. The requirement of adequate procedural safeguards applies to judicial orders as well as administrative schemes. *See Carroll v. President and Commissioners of Princess Anne*, 393 U.S. at 181 83, 89 S.Ct. 347.

**17.** An order under Rule 26(c) may differ from other judicial orders barring expression because the order can be limited to specific expression rather than imposing a restraint of unknown breadth on speech. As the Court noted in *Southeastern Promotions Ltd. v. Conrad*, 420 U.S. 546, 559, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975):

> [A] free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of free-wheeling censorship are formidable.

Typically the reach of judicial orders that have been condemned as prior restraints necessarily was unknown and unknowable at the time the order was issued. *See Near v. Minnesota*, 283 U.S. at 706, 51 S.Ct. 625 (injunction against as yet unpublished "scandalous" newspaper); *Organization for a Better Austin v. Keefe*, 402 U.S. at 418-19, 91 S.Ct. 1575 (injunction against distributing literature "of any kind"); *Nebraska Press Ass'n*, 427 U.S. at 545, 96 S.Ct. 2791 (order barring publication of any facts "strongly implicative" of the accused). *Cf. Oklahoma Publishing Co. v. District Court*, 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977) (order enjoining publication of juvenile's name and photograph).

Under Rule 26(c) the judge need not guess what the party will say, since the judge can consider each document. *See Pittsburgh Press Co.*, 413 U.S. at 390, 93 S.Ct. 2553, 2561, 37 L.Ed.2d 669 (upholding restriction where "order is based on a continuing course of repetitive conduct," court needn't "speculate as to the effect of publication"); *Kingsley Books*, 354 U.S. at 445, 77 S.Ct. 1325, 1330 (scheme for enjoining distribution of obscene books "studiously withholds restraint upon matters not already published").

The fact that the court could review specific documents before entering an injunction in *New York Times v. United States* led one commentator to question whether, under those circumstances, a judicial order restraining speech induces more self-censorship than criminal sanctions. If not, the differences between an injunction of that type and criminal sanctions might be insufficient to justify applying different constitutional standards in assessing their validity. *See Kalven, supra* note 15 at 33; *The Supreme Court, 1970 Term*, 85 Harv.L.Rev. 40, 309 (1971).

Also, unlike many judicial restraints on speech, an order pursuant to Rule 26(c) does bear, to some extent, a congressional imprimatur. Although not affirmatively enacted by Congress, the Federal Rules of Civil Procedure are subject to a mandatory 90-day "layover period" between the time that they are reported by the Chief Justice, and their effective date. 28 U.S.C. § 2072 (1976). The purpose of this layover period is clearly to permit legislative scrutiny and, where appropriate, legislative veto. *See, e. g.*, Act of Mar. 30, 1973, P.L. 93 12, 87 Stat. 9 (1973). *Cf. Walko Corp. v. Burger Chef Systems*, 180 U.S.App.D.C. 306, 554 F.2d 1165, 1168 n. 29 (1977) (Congressional inaction gives Federal Rules of Civil Procedure status "not of a legislative enactment, but of a regulation pursuant to the [Rules Enabling] Act [§ 2072].")

The absence of an authorizing legislative judgment has not typically been viewed as a characteristic of a prior restraint. *See, e. g., Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625 (1931) (injunction pursuant to statute authorizing abatement by injunction of malicious or scandalous newspaper a prior restraint). Nevertheless, it is clear that the Court has been willing to accord greater deference to a legislative judgment that restraint of expression is necessary than to a restraint imposed pursuant to the inherent powers of a court, *Bridges v. California*, 314 U.S. 252, 260-61, 62 S.Ct. 190, 86 L.Ed. 192 (1941); *Wood v. Georgia*, 370 U.S. 375, 385-86, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962), or the common law, *Cantwell v. Connecticut*, 310 U.S. 296, 307-08, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Indeed, in *New York Times v. United States*, 403 U.S. at 740-48, 91 S.Ct. 2140, Justice Marshall suggested that an impor-

■ We do not believe, however, that the proper resolution of this case in the end turns on whether this order can be termed a prior restraint. We observe the admonition of Justice Frankfurter that the term "prior restraint" should not be used as "a talismanic test," *Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 441, 77 S.Ct. 1325 (1957), and do not begin our examination with an almost insurmountable presumption against the validity of this order. However, the fact that the order poses many of the dangers of a prior restraint is sufficient to require close scrutiny of its impact on protected First Amendment expression.

The dissent does not dispute that the order has many of the characteristics of a "prior restraint," but contends that there are, in effect, two different types of prior restraints, one "solely directed at information and documents obtained in discovery" and a second covering all other orders restricting expression. Dissent at —— of 194 U.S.App.D.C., at 204 of 598 F.2d. Restraining orders directed at discovery materials are subject to less stringent scrutiny than other restraining orders, according to the dissent, because "[t]he First Amendment interests of litigants in the promulgation of materials exacted from another party through the compulsory processes of the courts are much more limited and of a

fundamentally different character" than litigants' other First Amendment interests. *Id.* at —— of 194 U.S.App.D.C., at 206 of 598 F.2d. We cannot agree with this bifurcated approach to the First Amendment's protection for speech.

### B. The First Amendment Interests of Litigants and Lawyers

#### 1. The First Amendment Interest in Litigation and the Administration of Justice

■ Defendants correctly point out that attorneys "have historically been 'officers of the courts[,]'" *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 792, 95 S.Ct. 2004, 2016, 44 L.Ed.2d 572 (1975), and that they have a legal and ethical responsibility to safeguard the right to a fair trial.[18] But lawyers' responsibility to protect the fairness of the judicial process does not mean that lawyers and litigants surrender their First Amendment rights at the courthouse door. Even public officials who have special responsibilities to the court do not necessarily have a "more severely curtailed" right to freedom of expression than "the average citizen." *Wood v. Georgia,* 370 U.S. 375, 393, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962).[19]

---

tant reason for treating that injunction by a standard different than for a criminal statute was the absence of congressional authorization for injunctive relief. *See also id.* at 730, 91 S.Ct. 2140 (Stewart, J., concurring); *id.* at 731–32, 91 S.Ct. 2140 (White, J., concurring); *Supreme Court, 1970 Term, supra* at 204.

18. In particular, defendants point to Rule 1–27(d) of the Local Rules of the District Court for the District of Columbia, which forbids an attorney in a civil action from making an extrajudicial statement about a case "if there is a reasonable likelihood that such dissemination will interfere with a fair trial." Defendants also note that the local Code of Professional Responsibility finds that "[n]ewspaper publications by a lawyer as to pending or anticipated litigation may interfere with a fair trial[,]" and cautions that "[g]enerally they are to be condemned." *Id.* The argument that the Code of Professional Responsibility should determine what discovery materials should be made public is specifically rejected in *Davis v. Romney,* 55 F.R.D. 337, 343 (E.D.Pa.1972).

19. In *Wood,* the Supreme Court reversed the contempt conviction of a deputy sheriff who had been publicly critical of a pending grand jury proceeding. The Court did not accept the contention that, because the deputy sheriff had a special responsibility to the court, he therefore had less First Amendment rights than an ordinary citizen. *Id.* at 393, 82 S.Ct. 1364. The sheriff's status did not provide "any basis for curtailing his right of free speech." *Id.* at 394, 82 S.Ct. at 1375. The Court stressed that the case involved an elected official, and that the "role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of public importance." *Id.* at 395, 82 S.Ct. at 1375. Attorneys—even if not elected officials—also perform a vital role in our society closely linked with interests protected by the First Amendment. *See In re Primus,* 436 U.S. 412, 431–32, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978). *See also In re Sawyer,* 360 U.S. 622, 631–36, 79 S.Ct. 1376, 3 L.Ed.2d 1473 (1959). And the fact that an attorney is presently involved in conducting a case does not, without

In fact, orders restraining extrajudicial comment by parties and lawyers have been uniformly held a serious restriction of fundamental First Amendment rights. In *CBS, Inc. v. Young*, 522 F.2d 234 (6th Cir. 1975), for example, the court of appeals confronted an order forbidding court personnel, counsel, parties, and the parties' "relatives, close friends, and associates" to discuss the case with the news media or the public. The court found the order impermissibly overbroad. *Id.* at 239. "According to its literal terms no discussions whatever about the case are permitted by the persons upon whom the ban is placed—whether prejudicial or innocuous, whether subjective or objective, whether reportorial or interpretive." *Id.* at 239–40. The court concluded that the order was "an extreme example of a prior restraint upon freedom of speech and expression . . . ." *Id.* at 240. Similarly, in *Chase v. Robson*, 435 F.2d 1059 (7th Cir. 1970), the appellate court considered an order that barred counsel and defendants from making any public statements about the merits of the case, the jury, the evidence, the witnesses, or the rulings of the court. Again, the reviewing court found insufficient justification for curtailing all of these statements; it concluded that the order was overbroad and that it constituted "a prior restraint on protected first amendment conduct." *Id.* at 1062.[20]

Litigation itself is a form of expression protected by the First Amendment. The Supreme Court has recently stressed that litigation may be "a vehicle for effective political expression and association, as well as a means of communicating useful

information to the public." *In re Primus*, 436 U.S. 412, 431, 98 S.Ct. 1893, 1904, 56 L.Ed.2d 417 (1978).[21] Moreover, as the Seventh Circuit has noted:

> . . . ., in our present society many important social issues became entangled to some degree in civil litigation. Indeed, certain civil suits may be instigated for the very purpose of gaining information for the public. Often actions are brought on behalf of the public interest on a private attorney general theory. *Civil litigation in general often exposes the need for governmental action or correction. Such revelations should not be kept from the public.* Yet it is normally only the attorney who will have this knowledge or realize its significance. . . . Therefore, we should be extremely skeptical about any rule that silences that voice.[22]

It is thus indisputable that attorneys and parties retain their First Amendment rights even as participants in the judicial process. For the very reasons that have led courts to conclude that lawyers and parties retain their First Amendment rights generally, we conclude that those rights extend to discovery materials.

### 2. *The First Amendment Interest in Discovery Materials*

The inherent value of speech in terms of its capacity for informing the public does not turn on how or where the information was acquired. *See First National Bank of Boston v. Bellotti*, 435 U.S. 765, 778–783, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). Even where information has been stolen, *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29

more, "make [his] out-of-court remarks more censorable," *id.* at 636, 79 S.Ct. at 1383.

20. *See Rodgers v. United States Steel Corp.*, 536 F.2d 1001, 1006 (3d Cir. 1975); *International Products Corp. v. Koons*, 325 F.2d 403, 408 09 (2d Cir. 1963); *Parker v. Columbia Broadcasting System, Inc.*, 320 F.2d 937, 939 (2d Cir. 1963).

21. *See also N.A.A.C.P. v. Button*, 371 U.S. 415, 429 431, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

22. *Chicago Council of Lawyers v. Bauer*, 522 F.2d at 258 (emphasis added). The court in that case held that the standing no-comment rules of the District Court for the Northern District of Illinois impermissibly restricted lawyers' expression. *Id.* at 249. Although the court concluded that the rules did not constitute a prior restraint (primarily because the collateral bar rule was inapplicable, *see In re Oliver*, 452 F.2d 111 (7th Cir. 1971)), it nevertheless subjected them to close scrutiny in light of the significant First Amendment interests at stake. 522 F.2d at 248–249.

L.Ed.2d 822 (1971); *Rodgers v. United States Steel Corp.*, 536 F.2d 1001, 1008 n. 16 (3d Cir. 1976), or retained in violation of a security agreement, *United States v. Marchetti*, 466 F.2d 1309, 1317 (4th Cir.), cert. denied, 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972), individuals who obtain such information have been held to have First Amendment rights in its dissemination.

A party's right to disseminate information is far stronger for discovery materials than for information that has been stolen or obtained in breach of contract. Generally speaking, when a party obtains documents or information through the discovery process, he can "use that information in any way which the law permits." *Leonia Amusement Corp. v. Loew's, Inc.*, 18 F.R.D. 503, 508 (S.D.N.Y.1955). *Accord Essex Wire Corp. v. Eastern Electric Sales Co.*, 48 F.R.D. 308, 312 (E.D.Pa.1969). The discovery rules themselves place no limitations on what a party may do with materials obtained in discovery. Under Rule 26(c), Fed.R.Civ.P., the party or person from whom discovery is sought must establish "good cause" for any restriction on the use of discovery documents.[23] The implication is clear that without a protective order materials obtained in discovery may be used by a party for any purpose, including dissemination to the public.[24]

Defendants do not argue that discovery materials generically constitute one of the "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). Unlike libelous falsehoods, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), or obscenities, *Miller v. California*, 413 U.S. 15, 23, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), or fighting words, *Chap-*

*linsky*, 315 U.S. at 572, 62 S.Ct. at 769, discovery materials cannot be described as a class of utterances of "no essential part of any exposition of ideas," or of "slight social value as a step to truth." *Id.* at 572, 62 S.Ct. at 769. In fact, the information contained in discovery documents in this case, pertaining to an allegedly illegal program of Government surveillance of citizens opposed to the war in Vietnam, lies near the heart of the information protected by the First Amendment. *First National Bank of Boston v. Bellotti*, 435 U.S. at 781, 98 S.Ct. 1407; *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966).

Defendants, citing *International Products Corp. v. Koons*, 325 F.2d 403 (2d Cir. 1963), nevertheless contend that plaintiffs voluntarily waived any First Amendment rights in discovery materials when they entered into the discovery process. Although one court, in dicta, has suggested that *Koons* can be interpreted as standing for this extreme proposition, *Rodgers v. United States Steel Corp.*, 536 F.2d at 1006, we think it should be read less broadly.

At issue in *Koons* was a restraining order forbidding the parties from publicly disclosing information contained in a deposition. Disclosure of the information, involving illegal payments to officials in South America, was said to be "contrary to the best interests of the foreign policy of the United States." 325 F.2d at 405. The court ruled that to the extent the order barred disclosure of information obtained before the deposition was taken, it was an impermissible prior restraint on First Amendment rights. *Id.* at 408–09. The court also stated, however, that

[t]he portion of the order which seals the deposition of Seldes and limits defendants and others in their use of information obtained therefrom was plainly authorized by F.R.Civ.Proc. [26(c)] and we enter-

---

23. "The rule requires that good cause be shown for a protective order. This puts the burden on the party seeking relief to show some plainly adequate reason therefor." 8 Wright & Miller, Federal Practice and Procedure § 2035 at 264–65 (1970).

24. 4 Moore's Federal Practice, ¶ 26.75 at n. 3 (1977–1978 Supp.). "Outside the area of trade secrets, research etc. the contemplation is that discovery proceedings are public proceedings and there is a heavy burden placed on a party seeking protection against disclosure."

tain no doubt as to the constitutionality of a rule allowing a federal court to forbid the publicizing, in advance of trial, of information obtained by one party from another by use of the court's processes. *Id.* at 407.

This passage does not say that parties have no First Amendment rights in discovery materials. At most, it establishes that a properly drawn restraining order, supported by a proper showing of good cause, is compatible with the First Amendment.[25] Significantly, this interpretation of *Koons* has been recently adopted in a case expressly holding that a party has First Amendment rights in information obtained in the discovery process. *Reliance Insurance Co. v. Barron's,* 428 F.Supp. 200, 204‑05 (S.D.N.Y.1977). *See Davis v. Romney,* 55 F.R.D. 337, 344‑45 (E.D.Pa.1972).

If *Koons* does stand for the proposition that the parties in a civil action waive all First Amendment rights in discovery materials, as the *Rodgers* court suggested in dicta,[26] then we think it is wrong. Waivers of First Amendment rights are to be inferred only in "clear and compelling" circumstances. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 145, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (Harlan, J.). *See Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Rodgers v. United States Steel Corp.,* 536 F.2d at 1007 n. 14. Plaintiffs here never agreed to forego any First Amendment claim related to discovery materials. Nor do we find clear and compelling evidence of an implied waiver of First Amendment rights in the system of civil discovery. As noted above, the presumption under the discovery rules is that a party may do anything it wants with discovery material, absent a protective order entered "for good cause shown." Fed.R. Civ.P. 26(c).

Furthermore, assuming arguendo that parties implicitly agree not to publicly disclose information obtained in the discovery process, this does not establish a waiver of First Amendment rights. Even where individuals have entered into express agreements not to disclose certain information, either by consent agreement, *Crosby v.*

25. The court also approved a portion of the order sealing all affidavits submitted by defendants on various motions, stating,

> we have no question as to the court's jurisdiction to do this under the inherent "equitable powers of courts of law over their own process, to prevent abuses, oppression, and injustices," [citations], or as to the propriety of the exercise of discretion here.

*Id.* at 407–08.

Defendants' reliance on *Dellums v. Powell,* 182 U.S.App.D.C. 244, 561 F.2d 242, *cert. denied,* 434 U.S. 880, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977), is similarly misplaced. There we affirmed the district court's denial of former President Nixon's motion to quash a subpoena *duces tecum* seeking transcripts of White House conversations in connection with a civil action for damages for alleged violation of constitutional rights. We noted, however, that our affirmance was without prejudice to any request by the former President for a protective order requiring

> that before any documents are disclosed in a public proceeding or record there would be due and ample notice to Mr. Nixon, and an opportunity to litigate the issue of need for public disclosure, on a determination to be made in the light of the actual litigating posture of the case and the contents of the document(s).

*Id.* at 249. Again, this only establishes that a properly limited restraining order may be obtained upon a proper showing of cause.

26. The *Rodgers* court had no occasion to determine the constitutional standards applicable to protective orders limiting dissemination of information obtained through discovery, and simply assumed the constitutionality of such orders for the purpose of argument:

> At the outset, we emphasize that we need not and do not consider here whether a protective order which prohibits parties or their counsel from disclosing information or matters obtained solely as a result of the discovery process is ever subject to the First Amendment's prohibitions against the establishment of laws that abridge freedom of speech.

*Rodgers v. United States Steel Corp.,* 536 F.2d at 1006.

Significantly, the *Rodgers* court *held* that the district court's order restricting counsel's speech constituted a prior restraint, *see,* pp. of 194 U.S.App.D.C., p. 187 of 598 F.2d, *supra,* and that a writ of mandamus would issue to vacate the order "to confine the district court to the proper sphere of its lawful power." *Rodgers* at 1006. *See* Section IV, *infra.*

*Bradstreet Co.,* 312 F.2d 483 (2d Cir.), *cert. denied,* 373 U.S. 911, 83 S.Ct. 1300, 10 L.Ed.2d 412 (1963); or by an employment contract and secrecy oath, *United States v. Marchetti,* 466 F.2d 1309 (4th Cir.), *cert. denied,* 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972), the courts have held that judicial orders enforcing such agreements are prior restraints implicating First Amendment rights.

 Defendants also appear to argue that because plaintiffs can obtain discovery materials only through the court's processes, the court can condition their access to these materials without regard to the First Amendment. Fed.Res.Br. at 27. This argument, first and most fundamentally, confuses plaintiffs' right of access to materials with restraints imposed on materials after they have been obtained. We agree that plaintiffs do not have a First Amendment right of access to information not generally available to members of the public. *Pell v. Procunier,* 417 U.S. 817, 834, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Zemel v. Rusk,* 381 U.S. 1, 16–17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *see also Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 609–10, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). A prohibition on what plaintiffs may say about information once they have obtained it, however, directly implicates the First Amendment.[27] *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 837–38, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978). Even if plaintiffs have no right to discovery materials, a court cannot condition the "privilege" of access on a waiver of First Amendment rights. As the Court observed in *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972):

> even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460. Such interference with constitutional rights is impermissible.[28]

 The conclusion that First Amendment rights attach to materials made available through the discovery process does not, however, end our inquiry. As plaintiffs acknowledge, the First Amendment is not an absolute, *see Near v. Minnesota,* 283 U.S. at 716, 51 S.Ct. 625, 75 L.Ed. 1357, and the protection afforded the exercise of First Amendment rights may be limited in certain narrow circumstances. In particular, protection of a subordinating public interest may justify narrowly drawn restrictions of First Amendment rights,

27. Since plaintiffs had 55 CIA documents in their possession when the order of February 14 was issued, they had standing to challenge the constitutionality of the order. In addition, plaintiffs had a statutory right to "any matter, not privileged, which is relevant to the subject matter involved in the pending action . . ." Fed.R.Civ.P. 26(b). Whether and under what circumstances petitioners would have standing to challenge an order entered *before* they obtained possession of any further documents we need not decide now.

28. The dissent finds it "anomalous" that, on the one hand, discovery may be denied completely without implicating the First Amendment, yet, on the other hand, restrictions on dissemination of discovery materials pose a significant First Amendment issue. The dissent's apparent confusion stems from its adherence to the discredited "benefits-privileges" distinction as elaborated in Justice Rehnquist's opinion in *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). Dissent at ——, —— of 194 U.S.App.D.C., at 207, 208, of 598 F.2d. That position was rejected by a majority of the Court. *See Arnett* at 211, 94 S.Ct. at 1672 (Marshall, J., dissenting) ("a majority of the Court rejects Mr. Justice Rehnquist's argument that because appellee's entitlement arose from statute, it could be conditioned on statutory limitation of procedural due process protections . . . .") *See generally,* L. Tribe, American Constitutional Law § 10–8.

*NAACP v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Thus, the appropriate constitutional standard governing the issuance of restraining orders under Rule 26(c) must take account of the important public interests in the functioning of the discovery process, and the unique characteristics of that process, as well as the First Amendment interest in unfettered expression. We proceed, then, to an examination of the constitutional standard which the trial judge must apply before entering a restraining order under Rule 26(c).

## C. *The Constitutional Standard*

■ Initially, the trial court must determine whether a particular protective order in fact restrains expression and the nature of that restraint. First Amendment interests will vary according to the type of expression subject to the order. An order restraining publication of official court records open to the public,[29] or an order restraining political speech,[30] implicates different interests than an order restraining commercial information.[31] The interests will also vary according to the timeliness of the expression. An order restraining highly newsworthy information[32] raises a different issue than a temporary restraint of materials having "constant but rarely topical interest."[33]

■ The court must then evaluate such a restriction on three criteria: the harm posed by dissemination must be substantial and serious;[34] the restraining order must be narrowly drawn and precise;[35] and there must be no alternative means of protecting the public interest which intrudes less directly on expression.[36]

---

**29.** *Oklahoma Publishing Co. v. District Court,* 430 U.S. at 310–11, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977); *Nebraska Press Ass'n,* 427 U.S. at 568, 96 S.Ct. 2791.

Arguably there is an absolute privilege to disseminate information contained in public court records. *See Oklahoma Publishing Co., supra; Nebraska Press Ass'n, supra; Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 495 96, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975). *See also* Barnett, *supra* note 15 at 545·46.

Plaintiffs here, however, cannot claim that privilege. The documents were disclosed pursuant to Rule 34 Fed.R.Civ.P. This rule, unlike other methods of discovering information under the Federal Rules, including depositions (Rule 30), interrogatories (Rule 33), and requests for admissions under Rule 36, does not provide that responsive material be filed with the court and made part of the public record. In practice, therefore, responses to requests for documents under Rule 34 do not become part of the public record unless one of the parties seeks to introduce them into evidence or to rely on them in a pleading. Since it does not appear that at this stage in the proceedings either party has entered any of the documents into the record, they are not "official records."

**30.** Political expression is at the core of the First Amendment's protection. *See, e. g., Landmark Communications, Inc. v. Virginia,* 435 U.S. at 838–39, 98 S.Ct. 1535; *Mills v. Alabama,* 384 U.S. 214, 218–19, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966); *New York Times v. Sullivan,* 376 U.S. 254, 269·-70, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

**31.** *Cf. Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 455-56, 98 S.Ct. 1912, 56 L.Ed.2d 444

(1978); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771 n. 24, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

**32.** *See Nebraska Press Ass'n,* 427 U.S. at 650–61, 96 S.Ct. 2791; *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

**33.** *Carroll v. President and Commissioners of Princess Anne,* 393 U.S. at 182, 89 S.Ct. 347 (quoting *A Quantity of Books v. Kansas,* 378 U.S. at 224, 84 S.Ct. 1723 (Harlan, J., dissenting)).

**34.** *See Landmark Communications, Inc. v. Virginia,* 435 U.S. at 844 45, 98 S.Ct. 1535; *Wood v. Georgia,* 370 U.S. at 384 85, 82 S.Ct. 1364; *Bridges v. California,* 314 U.S. at 262–63, 62 S.Ct. 190; *Chicago Council of Lawyers v. Bauer,* 522 F.2d at 249; *cf. Nebraska Press Ass'n,* 427 U.S. at 562, 96 S.Ct. 2791.

**35.** "An order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by the constitutional mandate . . . ." *Carroll v. President and Commissioners of Princess Anne,* 393 U.S. at 183, 89 S.Ct. at 353. *See also Procunier v. Martinez,* 416 U.S. 396, 413, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

**36.** *Nebraska Press Ass'n,* 427 U.S. at 563, 96 S.Ct. 2791; *Carroll,* 393 U.S. at 183–84, 89 S.Ct. 347; *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

In assessing the propriety of a protective order in each case (*i. e.,* whether there is "good cause" for an order which restricts expression), the trial court must consider and make the necessary findings on each element of the standard. Certain general considerations, however, will apply to most requests for a restraining order under Rule 26(c).

### 1. *Nature of the Harm Posed by Dissemination*

Widely varying interests have been advanced in support of restraining orders, from protection of national security information, *see International Products Corp. v. Koons,* 325 F.2d 403 (2d Cir. 1963), to preservation of privileged information, *Rodgers v. United States Steel Corp.,* 536 F.2d 1001 (3d Cir. 1976), to maintenance of trade secrets, *Natta v. Zletz,* 405 F.2d 99 (7th Cir. 1968). The weight of these interests will vary from case to case.

Rule 26 establishes a mechanism for accommodating the interest in "[m]utual knowledge of all the relevant facts gathered by both parties," *Hickman v. Taylor,* 329 U.S. 495, 507, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947), with these countervailing interests. The Rule requires general disclosure of information "relevant to the subject matter involved in the pending action," Fed.R.Civ.P. 26(b), unless the party from whom discovery is sought obtains a protective order to shield some competing interest. *Id.* at 26(c). To insure that this mechanism functions properly, the trial court must have flexibility in fashioning appropriate protective orders, including restraining orders.[37] Protective orders not only serve to protect against unfairness in a particular judicial proceeding, but may also help preserve the effective functioning of the civil discovery system more generally. A smoothly operating system of liberal discovery is in the interests of litigants and society as a whole, for it contributes to a full and fair airing of all material facts in controversy.[38] If parties are to be forthcoming in responding to requests for discovery, they must have fair assurance that legitimate countervailing interests will be protected, if necessary by a restraining order.

There can be no doubt that protecting the fairness of the judicial process is a substantial interest, for it is central to the maintenance of liberty. Accordingly, courts have always valued the need to protect the administration of justice from "abuses, oppression and injustice." *Gumbel v. Pitkin,* 124 U.S. 131, 144, 8 S.Ct. 379, 31 L.Ed. 374 (1888). "[T]he right of courts to conduct their business in an untrammeled way lies at the foundation of our system of government . . . ." *Wood v. Georgia,* 370 U.S. at 383, 82 S.Ct. at 1369.

When asked for a protective order based on the right to a fair trial, the trial court should assess the strength of the interest according to the following factors:

(a) Civil versus criminal trial. Although the right to a fair trial is fundamental to

---

**37.** Fed.R.Civ.P. 26(c), *supra* note 3, specifically contemplates restraining orders, including orders

(5) that discovery be conducted with no one present except persons designated by the court; (6) that a deposition after being sealed can be opened only by order of the court; (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way . . . .

**38.** *See, e. g.,* 8 Wright and Miller, Federal Practice and Procedure § 2001 at 14, 17-19.

[I]t should be remembered that under the prior [discovery] procedure the means by which parties could narrow the issues and discover information needed to prepare for trial were very limited. Under the philosophy that a judicial proceeding was a battle of wits rather than a search for the truth, each side was protected to a large extent against disclosure of his case.

. . . Some of these purposes [of the liberal discovery rules] are to avoid surprise and the possible miscarriage of justice, to disclose fully the nature and scope of the controversy, to narrow, simplify, and frame the issues involved, and to enable a party to obtain the information needed to prepare for trial. In this way it was sought to put an end to the "sporting theory of justice," by which the result depends on the fortuitous availability of evidence or the skill and strategy of counsel.

both civil and criminal litigation,[39] there are important distinctions between the two in this context.

> [A]lthough we rightfully place a prime value on providing a system of impartial justice to settle civil disputes, we require even a greater insularity against the possibility of interference with fairness in criminal cases. Perhaps this is symbolically reflected in the Sixth Amendment's requirement of an "impartial jury" in criminal cases whereas the Seventh Amendment guarantees only "trial by jury" in civil cases.

*Chicago Council of Lawyers v. Bauer*, 522 F.2d 242, 257–58 (7th Cir. 1975), *cert. denied*, 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976).[40]

(b) Bench trial versus jury trial. The principal concern about pretrial publicity is that it will prejudice a lay jury. It is true that judges, too, are human. *Cox v. Louisiana*, 379 U.S. 536, 565, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). But life-tenured judges are "supposed to be men of fortitude, able to thrive in a hardy climate." *Craig v. Harney*, 331 U.S. 367, 376, 67 S.Ct. 1249, 1255, 91 L.Ed. 1546 (1974); *In re Little*, 404 U.S. 553, 555, 92 S.Ct. 659, 30 L.Ed.2d 708 (1972). Although the threat of prejudicial publicity is entitled to some weight in a bench trial, *see Chicago Council of Lawyers v. Bauer*, 522 F.2d at 256–57, it is entitled to greater weight where a jury trial has been demanded.

### 2. *Precision of the Restriction*

To establish "good cause" for a protective order under Rule 26(c), "[t]he courts have insisted on a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements. . . . " 8 Wright & Miller, Federal Practice and Procedure § 2035 at 265 (1970).[41] This requirement is constitutionally mandated when the order restricts expression, *see Chase v. Robson*, 435 F.2d at 1061, to assure that the order is no broader than absolutely necessary to protect the countervailing interest. An order restraining speech cannot be based on a record that reveals only naked speculation that the right to a fair trial might be jeopardized. *Nebraska Press Ass'n*, 427 U.S. at 569, 96 S.Ct. 2791. Thus, in determining whether "good cause" exists to issue a restraining order limited to discovery material and to lawyers and parties, the trial court must also require a specific showing that dissemination of the discovery materials would pose a concrete threat to an important countervailing interest.[42]

---

**39.** *Chicago Council of Lawyers v. Bauer*, 522 F.2d at 257–58.

**40.** It is also relevant that civil litigation frequently lasts much longer than a criminal trial. A civil restraining order will therefore generally restrict expression for a longer period of time, and it is also more likely that the prejudicial effect of pre-trial publicity will be diluted by the time the trial is reached. *Chicago Council of Lawyers*, 522 F.2d at 258.

**41.** *See, e. g., Reliance Insurance Co. v. Barrons*, 428 F.Supp. 200, 202–03 (S.D.N.Y.1977); *Davis v. Romney*, 55 F.R.D. 337, 340 (E.D.Pa.1972); *Williams v. Johnson & Johnson*, 50 F.R.D. 31, 33 (S.D.N.Y.1970); *In re Natta*, 264 F.Supp. 734, 742 (D.Del.1967), *aff'd*, 388 F.2d 215 (3d Cir. 1968); *Vogue Instrument Corp. v. Lem Instruments Corp.*, 41 F.R.D. 346, 349 (S.D.N.Y. 1967).

**42.** The protection afforded expression by the First Amendment would be illusory if every conceivable threat to an important public interest, no matter how remote or speculative, were sufficient to justify a restriction of speech. Yet, as the Supreme Court noted in *Nebraska Press Ass'n*, 427 U.S. at 563, 96 S.Ct. 2791, a determination of the likelihood of future harm from as yet unuttered speech will necessarily be speculative. Courts have struggled mightily to capture in words the requisite probability of harm mandated by the First Amendment, seeking to maximize the range of possible expression consistent with the valid claims of important conflicting interests. From the days of Holmes' "clear and present danger," *see Schenck v. United States*, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919), various formulations have been put forward to crystalize the appropriate standard.

To justify restrictions on lawyers and litigants in order to protect the right to a fair trial, two such formulations have predominated. 1) "reasonable likelihood" of harm, which is the basis of Local Rule 1–27(d), has been adopted by several other courts. *See, e. g., U. S. v. Tijerina*, 412 F.2d 661, 666 (10th Cir.), *cert. denied*, 396 U.S. 990, 90 S.Ct. 478, 24 L.Ed.2d 452 (1969); *Society of Professional Journalists*

Except in unusual circumstances, a protective order issued under Rule 26(c) can be tailored to avoid many of the infirmities associated with judicial restraints on expression. If the party against whom discovery is sought makes a timely motion for a protective order, the court can examine the relevant documents or information *in camera* before determining whether a restraining order should issue. *See Kerr v. United States District Court*, 426 U.S. 394, 404–06, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976). In appropriate cases, opposing counsel

should be permitted to participate in such *in camera* proceedings, so that the judge will have the benefit of adversarial presentation.[43] The court should therefore have no difficulty drafting a narrow order covering only specifically identified materials that may be proscribed consistent with the First Amendment. In short, when judicial restraints on discovery materials are involved, there should be no need for the court to issue vague or overbroad orders, or to speculate "in advance what [the speaker] will say." *Southeastern Promotions Ltd. v.*

*v. Martin*, 431 F.Supp. 1182, 1188 (D.S.C.), *aff'd with qualifications*, 556 F.2d 706 (4th Cir. 1977), *cert. denied*, 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 771 (1978); *Hirschkop v. Va. State Bar*, 421 F.Supp. 1137, 1148–52 (E.D.Va.1976).

2) Other courts have held that the "reasonable likelihood" standard provides insufficient protection for the First Amendment interests, and have required a "serious and imminent threat" of harm before restricting comment by lawyers and parties. *See e. g., Chicago Council of Lawyers*, 522 F.2d at 249; *In re Oliver*, 452 F.2d 111, 114 (7th Cir. 1971); *see also C.B.S. v. Young*, 522 F.2d 234, 238 (6th Cir. 1975) ("clear and present danger"). The ABA recently revised its standards for proscribing extra-judicial statements by attorneys (Standard 8–1.1) to prohibit only those statements which pose a "serious and imminent threat" to a fair trial. The ABA concluded that "the reasonable likelihood test is too relaxed to provide full protection to the first amendment interests of attorneys." ABA Standards—Fair Trial and Free Press (2d ed. Tentative draft) 3 (1978).

We recognize, however, that prejudice to a fair trial is not the only danger posed by unfettered dissemination of discovery materials. Inevitably, the possibility of dissemination will lessen (to some degree) judges' willingness to order liberal discovery, and inhibit willing compliance with discovery requests. To maximize the full flow of discovery would require nothing short of a blanket prohibition on disclosure. Yet such a rule would clearly cut too deeply into First Amendment freedoms, and would render meaningless Rule 26(c)'s requirement of "good cause."

In view of our disposition of this case, we need not choose among the competing standards. We decide today that an order restricting dissemination must be based on full assessment of the interests at stake, with party seeking the restraining order bearing the burden of making a concrete and specific showing of the likelihood of harm. The failure of the district court to consider these factors, and to make the necessary findings, undermines the validity of its order. We are reluctant at this time to fashion a hard and fast standard governing the requisite likelihood of harm which would justi-

fy all restrictive orders under Rule 26(c). Dissemination of different categories of discovery documents, in conjunction with different types of litigation, may well pose greater or lesser risks to the discovery process, and thus may require different treatment under Rule 26(c). We express no opinion on that issue at this time, preferring instead to permit trial courts to develop greater experience under the general standards set forth in our opinion today. Nevertheless, we stress that the mere allegation of conjectural harm is insufficient to meet the moving party's burden.

**43.** The infirmities associated with *ex parte* orders, *see Carroll*, 393 U.S. at 183–85, 89 S.Ct. 347, strongly militate against issuing protective orders without participation by both parties. There should be no barriers to participation by counsel for both sides, particularly where, as here, both parties already have the materials in their possession. Both parties have been permitted to participate in *in camera* proceedings in other contexts. *See, e. g., United States v. Nixon*, 418 U.S. 683, 715 n. 21, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Black v. Sheraton Corp. of America*, 184 U.S.App.D.C. 46, 59–60, 564 F.2d 531, 544–45 (1977); *Dellums v. Powell*, 561 F.2d at 251. *Cf. United States v. American Telephone and Telegraph Co.*, 179 U.S.App. D.C. 198, 209, 210–211, 567 F.2d 121, 132, 133–34 (1977).

Since protective orders pursuant to Rule 26(c) pose dangers similar to other prior restraints, they should not be entered without the necessary "procedural safeguards designed to obviate the dangers of a censorship system." *Freedman v. Maryland*, 380 U.S. at 58, 85 S.Ct. 734, 739, 13 L.Ed.2d 649. This means, at a minimum, actual notice of the proposed restraint, *Carroll v. President and Commissioners of Princess Anne*, 393 U.S. at 181, 89 S.Ct. 347, a judicial determination in an adversary proceeding, *Blount v. Rizzi*, 400 U.S. 410, 418, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971); *Freedman v. Maryland*, 380 U.S. at 58, 85 S.Ct. 734; and prompt appellate review, *see National Socialist Party v. Skokie*, 432 U.S. at 44, 97 S.Ct. 2205.

*Conrad*, 420 U.S. at 559, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448.

### 3. *Less Intrusive Alternatives*

A protective order pursuant to Rule 26(c) may be the least intrusive means of achieving the goals of protecting the fairness of the judicial process and preserving the discovery system. An order directed only against parties and lawyers undoubtedly represents a less sweeping curtailment of First Amendment rights than, *e. g.*, an order broadly restraining the press.[44] Although, from the public's point of view, the probable effect of such an order will be to dry up a valuable source of news about the trial, and although this is a serious consequence, *CBS, Inc. v. Young*, 522 F.2d at 239, an order binding the entire news media will likely have the much more serious effect of depriving the public information about the trial altogether. Similarly, an order barring all comment on a pending case by lawyers and litigants would restrict expression more drastically.[45]

The only plausible alternative to a protective order may be the denial of discovery altogether. Such a result benefits no one, for in neither event will the public learn the contents of the discovery material, and when discovery is denied, the litigant will be deprived of information relevant to the preparation of the case.[46]

However, when the threatened harm is prejudice to a fair trial, a number of alternatives less restrictive of expression may be available. They include

(a) change of trial venue to a place less exposed to . . . intense publicity . . . ; (b) postponement of the trial to allow public attention to subside; (c) searching questioning of prospective jurors . . . to screen out those with fixed opinions as to guilt or innocence; (d) the use of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court[;] (e) [s]equestration of jurors [to] . . . enhance[] the likelihood of dissipating the impact of pretrial publicity and emphasize[] the elements of the jurors' oaths.

*Nebraska Press Ass'n*, 427 U.S. at 563–64, 96 S.Ct. at 2805; *see also Sheppard v. Maxwell*, 384 U.S. 333, 357–62, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Not all of these measures will be available or feasible in every case, but they should be carefully considered before resorting to a restraining order.

■ These considerations demonstrate that, in appropriate cases, an order restricting the dissemination of discovery materials under Rule 26(c) may survive constitutional scrutiny. We stress, however, that *in each case*, before entering a protective order that restricts expression, the trial judge must determine that it meets those criteria mandated by the First Amendment. Different orders will have different impact on expression. Only in the context of particular discovery material and a particular trial setting can a court determine whether the threat to substantial public interests is sufficiently direct and certain. Only in a particular case can the judge determine whether an order is sufficiently narrow and precise to accomplish the desired goal with the

---

**44.** Although the Supreme Court has never squarely addressed the issue, its decisions suggest that orders restricting comments by parties and attorneys are a less drastic alternative to gagging the press. *See, e. g., Sheppard v. Maxwell*, 384 U.S. 333 at 359, 361–62, 363, 86 S.Ct. 1507, 16 L.Ed.2d 600; *Nebraska Press Ass'n*, 427 U.S. at 564 & n. 8, 96 S.Ct. 2791 & n. 8; *id.* at 601 & n. 27, 96 S.Ct. 2791 & n. 27 (Brennan, J., concurring). *But cf. Chicago Council of Lawyers*, 522 F.2d at 250.

**45.** Thus, even the courts which have found particular protective orders against dissemination of discovery materials to be constitutional,

*Koons*, 325 F.2d at 407–08; *Rodgers*, 536 F.2d at 1006 (dicta), have struck down on constitutional grounds restraints on material gathered outside the discovery process. *See Koons* at 408–09, *Rodgers* at 1006–1008.

**46.** Accordingly, it has been suggested that while a party bears a substantial burden to demonstrate "good cause" for orders restricting dissemination of discovery materials, the burden is even heavier for denial of discovery altogether. 4 Moore's Federal Practice § 226.-69 and cases cited in note 1.

least restriction on expression. And only in the particular case can the judge determine whether alternative methods with less intrusive impact on expression could accomplish the same goal.[47]

## III. THE ORDER OF FEBRUARY 14, 1977

██ Applying these principles, we have no difficulty concluding that the district court's order of February 14, 1977 is seriously infirm. By preventing plaintiffs from divulging or commenting on the documents at issue, the order restrained them from criticizing certain government practices. To justify such a restriction on political expression, the government does not contend that it is necessary to protect national security or the privacy of third parties.[48] Rather, counsel for defendants merely asserted that the intended news release would be "prejudicial to adjudication of these issues . . . in an uncolored and unbiased climate," [49] without providing any evidence to support this conclusory allegation.[50]

The district court made no evaluation of the First Amendment interests at stake, nor any finding that release of the documents would preclude a fair trial. Yet the district court broadly restrained the dissemination of an indeterminate amount of material of unknown content, barring extra-judicial statements about any discovery documents not made part of the public record. The order bars plaintiffs and their counsel from making extra-judicial statements about *any* discovery documents not made part of the public record. When the order was issued, plaintiffs had 55 CIA documents in their possession, App. at 23, and defendants had promised to hand over additional documents in the near future. Supplementary Appendix (Supp.App.) at 34-35. But the only materials the court had actually examined, in addition to the moving papers, memoranda, and correspondence between the parties, were: a two-paragraph letter from counsel for plaintiffs describing three documents plaintiffs proposed to release to the news

---

**47.** We recognize that flexibility will be required to accommodate the practical needs of the discovery process with the standards enunciated herein, particularly where the discovery embraces a large quantity of documents. It may be appropriate for example, for a trial court (on a proper showing) to issue a blanket protective order covering all documents in a large-scale exchange of files without prejudice to raising the merits of the protective order as applied to particular documents at a later time. If a party wishes to disseminate a particular document, he might then inform the opposing party (precisely as plaintiffs have done here). At that point the burden would revert back to the party resisting dissemination to establish "good cause" as applied to the particular document(s), consistent with the standards enunciated in this opinion. This procedure is commonly used to preserve parties' right to assert claims of privilege with respect to particular documents in complex cases, while at the same time facilitating needed discovery.

This example illustrates that a proper regard for First Amendment interests need not interfere significantly with the operation of the discovery process.

**48.** See p. 3, *supra.*

**49.** In their memorandum in support of their Motion for a Protective Order, defendants also suggested that the order was necessary to prevent abuse of court process. There is no indication, however, that this litigation is not seri-

ous or that it was brought for the purpose of disclosing the documents in question. Instead, the record reflects that plaintiffs are interested in vindicating their constitutional rights and simultaneously publicizing their grievances. To the extent that defendants meant to contend that this dual goal evidenced an abuse of court process, they were mistaken. *See In re Primus,* 436 U.S. at 431-32, 98 S.Ct. 1893; *Chicago Council of Lawyers v. Bauer,* 522 F.2d at 258.

**50.** The dissent elaborates at length its view of the "climate" surrounding this litigation: an "onslaught" against the CIA generating "massive and concentrated" publicity. Dissenting op. at ‐ ‐ ‐ of 194 U.S.App.D.C., at 200-201 of 598 F.2d. The purpose of this characterization is unclear. Perhaps these "findings" are intended to compensate for the totally barren record on which the district court order was based.

We note, however, that even if the dissent's speculations were established, the harm caused by plaintiffs' release of discovery material would still not have been ascertained. Since a court has no way of controlling prior publicity, the relevant consideration in such circumstances is the marginal harm to the litigative environment that is likely to occur as a result of further disclosure, not the harm that has already occurred.

media; photocopies of these three documents; and a draft press release, slightly over one page in length, interpreting the significance of these three documents. The court accordingly had no way of knowing what was contained in the bulk of the materials enjoined, or whether material other than the three documents and press release would be prejudicial if released.[51]

The district court failed even to assess the specific harm posed by the three documents actually before it, concluding only that "extra-judicial statements of disclosure of discovery materials . . . are contrary to rules applicable to the conduct of litigation before this Court and inconsistent with the obligations of parties and their counsel to further the just determination of matters within its jurisdiction. . . ." App. at 1.[52]

Finally, the defendants made no showing, nor the court any finding, that potential

prejudice could not be avoided by means less intrusive on expression.[53]

Judged by the standards imposed by Rule 26(c) and the First Amendment, the district court's order is indisputably deficient. It prohibits political expression, yet it is silent as to its reasons, rests on no express findings, and is unsupported by any evidence.

## IV. THE PROPRIETY OF MANDAMUS

Plaintiffs seek a writ of mandamus.[54] We are empowered to issue such writs by the All Writs Act, 28 U.S.C. § 1651(a) (1976):

The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.[55]

---

**51.** "Even in the presence of sufficient justification for curtailing certain first amendment utterances, an order must be drawn narrowly so as not to prohibit speech which will not have an effect on the fair administration of justice along with speech which will have such an effect." *Chase v. Robson*, 435 F.2d 1059, 1961 (7th Cir. 1970). *Accord CBS, Inc. v. Young*, 522 F.2d 234, 242 (6th Cir. 1975).

**52.** The district court merely signed defendants' proposed order and failed to make any independent findings on these questions. We thus have no way of knowing exactly why the district court concluded that the possibility of a fair trial was in danger. It might have reasoned, for example, that release of the documents would so bias the litigative climate as to reduce the likelihood of an unprejudiced decision. But the court failed to make the findings necessary to support such reasoning. There is no explicit finding that the documents in question are so sensational in nature as to generate massive and prejudicial publicity. Such a finding, at least with respect to the three documents plaintiffs planned to release at their press conference on January 31, 1977, would at present be highly unlikely, since the New York Times published a story summarizing their contents on February 22, 1977. *See* p. —— of 194 U.S.App.D.C., p. 182 of 598 F.2d, *supra*.

As this case was to be tried to a judge rather than to a jury, this reasoning also entails the anomalous premise that a trial judge, trained in law, would, after evaluating specific documents, be unduly prejudiced by the reappearance of these same documents in the news

media. The district court might have had in mind, of course, the possible impaneling of an advisory jury under Fed.R.Civ.P. 39(c). But the court made no findings to that effect, nor did it assay any conclusions about less drastic means of preserving this possible jury from the effects of prejudicial publicity. *See Nebraska Press Ass'n*, 427 U.S. at 563–65, 96 S.Ct. 2791.

**53.** In this case, for example, the district court's order was entered in the early stages of what promised to be lengthy pre-trial proceedings. The court made no finding, however, that time alone would not blunt the effects of whatever adverse publicity might be expected.

**54.** *See* note 1 *supra*.

**55.** The authority of a United States Court of Appeals to issue a writ of mandamus

is not confined to the issuance of writs in aid of a jurisdiction already acquired by appeal but extends to those cases which are within its appellate jurisdiction although no appeal has been perfected. Otherwise the appellate jurisdiction could be defeated and the purpose of the statute authorizing the writ thwarted by unauthorized action of the district court obstructing the appeal. *Ex parte Bradstreet*, 7 Pet. 634, 8 L.Ed. 810; *Insurance Company v. Comstock*, 16 Wall. 258, 270, 21 L.Ed. 493; *McClellan v. Carland, supra*, 217 U.S. 280, 30 S.Ct. 504, 54 L.Ed. 762; *Ex parte United States*, 287 U.S. 241, 246, 53 S.Ct. 129, 77 L.Ed. 283; *cf. Ex parte Siebold*, 100 U.S. 371, 374–5, 25 L.Ed. 717; *Ex parte Peru*, 318

■ The remedy of mandamus "is a drastic one, to be invoked only in extraordinary situations." *Kerr v. United States District Court,* 426 U.S. at 402, 96 S.Ct. at 2123. Although the traditional touchstone for the use of the writ in aid of appellate jurisdiction has been the necessity of confining "an inferior court to a lawful exercise of its prescribed jurisdiction," *Roche v. Evaporated Milk Ass'n,* 319 U.S. 21, 26, 63 S.Ct. 938, 941, 87 L.Ed. 1185 (1943), "courts have never confined themselves to an arbitrary and technical definition of 'jurisdiction' . . . ." *Will v. United States,* 389 U.S. 90, 95, 88 S.Ct. 269, 273, 19 L.Ed.2d 305 (1967). Instead the writ has issued to correct those exceptional circumstances where there has been a "clear abuse of discretion or 'usurpation of judicial power' . . . ." *Bankers Life & Casualty Co. v. Holland,* 346 U.S. 379, 383, 74 S.Ct. 145, 148, 98 L.Ed. 106 (1953). *See Schlagenhauf v. Holder,* 379 U.S. 104, 110, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964).

■ Although mandamus is a common law writ, it may, "like equitable remedies, . . . be granted or withheld in the sound discretion of the Court . . ." *Ex parte Peru,* 318 U.S. 578, 584, 63 S.Ct. 793, 797, 87 L.Ed. 1014 (1943). Various doctrines govern the issuance of the writ. A petition for mandamus will be denied where "other adequate remedy is available," *id.,* or where its issuance would "thwart the congressional policy against piecemeal appeals." *Parr v. United States,* 351 U.S. 513, 521, 76 S.Ct. 912, 917, 100 L.Ed. 1377 (1956). A petitioner for mandamus must thus demonstrate that "appeal is a clearly inadequate remedy." *Ex parte*

*Fahey,* 332 U.S. 258, 260, 67 S.Ct. 1558, 1559, 91 L.Ed. 2041 (1947), because he "will be damaged or prejudiced in a way not correctable on appeal." *Bauman v. United States District Court,* 557 F.2d 650, 654 (9th Cir. 1977). Consideration will be given to the severity and extent of this damage,[56] and in particular to whether a petitioner has lost precious constitutional rights.[57] A petitioner for mandamus must also demonstrate that his "right to issuance of the writ is 'clear and indisputable,' " *Bankers Life & Casualty Co. v. Holland,* 346 U.S. at 384, 74 S.Ct. at 148, although "writs will issue where the question of jurisdiction is undecided." *Morrow v. District of Columbia,* 135 U.S.App.D.C. 160, 169, 417 F.2d 728, 737 (1969).

■ After careful consideration of these many factors, we conclude that mandamus is appropriate in this case. Plaintiffs have demonstrated the "special circumstances which . . . justify the issuance of the writ . . . ." *Roche v. Evaporated Milk Ass'n,* 319 U.S. at 31, 63 S.Ct. at 944. The order restrains plaintiffs' expression, yet the court made no assessment of the strength of the continuing interest, the need for such a broad restriction, or the availability of alternative measures. In the absence of these findings, the petitioner's right to be free of the restriction is clear and indisputable.

A number of courts have issued the writ of mandamus in order to strike down similar restraints.[58] In this case the district court's issuance of an overbroad restraint without any findings or particularized showing whatsoever is "so 'egregiously erroneous' that the action could be deemed a

U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014, and cases cited.
*Roche v. Evaporated Milk Ass'n,* 319 U.S. 21, 25, 63 S.Ct. 938, 941, 87 L.Ed. 1185 (1943).

56. *See United States Alkali Export Ass'n v. United States,* 325 U.S. 196, 202–204, 65 S.Ct. 1120, 89 L.Ed. 1554 (1945); *Pfizer, Inc. v. Lord,* 456 F.2d 545, 548 (8th Cir. 1972).

57. *See Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 472–73, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 501, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); *Winters v. Travia,* 495 F.2d 839 (2d Cir. 1974);

*Sanders v. Russell,* 401 F.2d 241, 244 (5th Cir. 1968).

58. *See, e. g., Coles v. Marsh,* 560 F.2d 186, 189 (3d Cir.), *cert. denied,* 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479 (1977); *Rodgers v. United States Steel Corp.,* 536 F.2d at 1006; *CBS, Inc. v. Young,* 522 F.2d at 237; *Rodgers v. United States Steel,* 508 F.2d 152, 161–65 (3d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *Chase v. Robson,* 435 F.2d at 1062.

'usurpation of power.'" *Plekowski v. Ralston-Purina Co.,* 557 F.2d 1218, 1220 (5th Cir. 1977). As the Third Circuit stated in reviewing a restraining order imposed by a district court on a party and her attorney, "[i]mposition of an order on anything less than a clear showing of particularized need removes it from the area of discretion unreviewable by mandamus." *Coles v. Marsh,* 560 F.2d 186, 189 (3d Cir.), *cert. denied,* 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479 (1977).

Mandamus is especially appropriate in this case because plaintiffs have no other available adequate remedy. The Supreme Court has frequently noted the importance of timeliness to the rights of expression protected by the First Amendment. *See, e. g., Nebraska Press Ass'n,* 427 U.S. at 559, 96 S.Ct. 2791. "It is vital to the operation of democratic government that the citizens have facts and ideas on important issues before them. A delay of even a day or two may be of crucial importance in some instances." *Carroll v. President and Commissioners of Princess Anne,* 393 U.S. 175, 182, 89 S.Ct. 347, 352 (1968), *quoting with approval, A Quantity of Books v. Kansas,* 378 U.S. 205, 224, 84 S.Ct. 1723 (Harlan, J., dissenting). The Court has thus stressed the necessity of "immediate appellate review" of court issued restraints. *National Socialist Party of America v. Skokie,* 432 U.S. 43, 44, 97 S.Ct. 2205 (1977) (per curiam). *See Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 485–86, 95 S.Ct. 1029 (1975). The duration of a trial is intolerably long when measured by this First Amendment clock. *Bridges v. California,* 314 U.S. 252, 268–69, 62 S.Ct. 190 (1941). Appeal is therefore a clearly inadequate remedy for plaintiffs. If they were forced to wait for appellate review until a final disposition of their case by the district court, their First Amendment rights to timely expression would be irretrievably lost. *Nebraska Press Ass'n v. Stuart,* 423 U.S. 1327, 1329–30, 96 S.Ct. 251, 46 L.Ed.2d 237 (1975) (Blackmun, J. in chambers); *Citizens for a*

*Better Environment v. City of Park Ridge,* 567 F.2d 689, 691 (7th Cir. 1975).

The only other remedy available to plaintiffs is to test the validity of the district court's order through contempt proceedings. Even assuming, however, that the collateral bar rule would not apply to such a proceeding, *see United States v. Ryan,* 402 U.S. 530, 532 n. 4, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971), we conclude that it would not provide an adequate avenue of relief. The puissant threat of contempt might well suffocate the "breathing space" necessary for the exercise of petitioners' First Amendment rights. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 271–72, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). As the Seventh Circuit said in reviewing by mandamus a restraining order imposed by a district court, "[s]ince there is likelihood that the order will have a chilling effect on speech, defendants should not be forced to assert the invalidity of the order as a defense in a contempt proceeding. *Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)." *Chase v. Robson,* 435 F.2d at 1062. It is true that in the past we have required petitioners for mandamus to contest through contempt proceedings the validity of orders limiting the scope or availability of discovery. *See National Right to Work Legal Defense and Education Foundation, Inc. v. Richey,* 167 U.S.App.D.C. 18, 24, 510 F.2d 1239, 1245, *cert. denied,* 422 U.S. 1008, 95 S.Ct. 2631, 45 L.Ed.2d 671 (1975). Challenges to such discovery orders by mandamus are particularly disfavored,[59] since they undermine the congressional policy against piecemeal appeals. *See Usery v. Ritter,* 547 F.2d 528, 532 (10th Cir. 1977); *cf. Gardner v. Westinghouse Broadcasting Co.,* 437 U.S. 478, 98 S.Ct. 2451, 2453, 57 L.Ed.2d 364 (1978). This is because the underlying cause of action in the district court is derailed while such challenges are decided. In appropriate cases, however, courts have entertained challenges to dis-

---

**59.** *See Kerr v. United States District Court,* 426 U.S. 394, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976); *Dow Chemical Co. v. Taylor,* 519 F.2d 352, 355–56 (1975); *Grinnell Corp. v. Hackett,* 519 F.2d 595, 598–99 (1st Cir.), *cert. denied,* 423 U.S. 1033, 96 S.Ct. 566, 46 L.Ed.2d 407 (1975).

covery orders by mandamus.[60] In the instant case, the underlying trial of petitioners' claims continues unaffected by our disposition of this mandamus petition. The district court's order, in other words, affects rights of petitioners that are "separable from, and collateral to" rights asserted in their complaint. *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *See United States v. Schiavo*, 504 F.2d 1, 4–5 (3d Cir.) (en banc), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 690, 42 L.Ed.2d 688 (1974).[61]

### V.

In accordance with our usual practice, we will not issue the writ at this time. Instead, we will transmit a copy of this opinion to the district court to permit further proceedings in light of the discussion herein.[62] Defendants are free to seek a new restraining order if they are able to present

a detailed showing that a narrowly drafted order restraining promulgation of the documents by plaintiffs would be constitutional under the principles outlined in this opinion. It will remain open, however, for the parties to seek such further relief from this court as the circumstances may require.

*Judgment accordingly.*

WILKEY, Circuit Judge, dissenting:

The onslaught against the CIA started in late 1974 when an investigative reporter for a national newspaper charged in a series of articles that the agency had engaged in a "massive illegal domestic intelligence operation" in direct violation of its charter.[1] In the months that followed, media attention riveted on alleged CIA lawlessness with an intensity matched in recent times only by coverage of the Watergate scandals.[2] This

---

**60.** *See, e. g., Schlagenhauf v. Holder*, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964); *In re United States*, 348 F.2d 624 (1st Cir. 1965); *International Products Inc. v. Koons*, 325 F.2d 403 (2nd Cir. 1963); *United States Board of Parole v. Merhige*, 487 F.2d 25 (4th Cir. 1973), *cert. denied*, 417 U.S. 918, 94 S.Ct. 2625, 41 L.Ed.2d 224 (1974); *Colonial Times v. Gasch*, 166 U.S.App.D.C. 184, 509 F.2d 517 (1975); *Harper & Row Publishing Co. v. Decker*, 423 F.2d 487 (7th Cir. 1970), *aff'd without opinion by an equally divided court*, 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971); *Pfizer v. Lord*, 456 F.2d 545 (8th Cir. 1972); *Heathman v. United States District Court*, 503 F.2d 1032 (9th Cir. 1974); *Usery v. Ritter*, 547 F.2d 528 (10th Cir. 1977).

**61.** In *Schiavo* the Third Circuit, relying on the "collateral order" doctrine of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221 (1949), decided that a restraining order addressed to the news media was an appealable final order under 28 U.S.C. § 1291. In *Parker v. Columbia Broadcasting Systems, Inc.*, 320 F.2d 937 (2d Cir. 1963), the Second Circuit held that a gag order addressed to a party, her attorney and "her agents" was appealable under 28 U.S.C. § 1292(a)(1) as a preliminary injunction. *See also Gardner v. Westinghouse Broadcasting Co.*, 437 U.S. 478, 98 S.Ct. 2451, 2453, 57 L.Ed.2d 364 (1978).

Since the petitioners have sought a writ of mandamus and since we conclude that we have jurisdiction to issue this extraordinary writ, we do not reach the question whether the restraining order in this case would be appealable under either § 1291 or § 1292(a)(1).

**62.** *See In re Zweibon*, 184 U.S.App.D.C. 167, 173, 565 F.2d 742, 748 (1977); *Relf v. Gasch*, 167 U.S.App.D.C. 238, 242, 511 F.2d 804, 808 (1975).

**1.** *New York Times*, 22 December 1974, at 1. For a later, more reflective view, see "The War on the CIA," *Washington Post*, 12 November 1978, pp. B–1 *et seq.*

**2.** Apparently, some media coverage of the CIA during this period was tendentious or inaccurate. In his statement before the House Appropriations Committee on 20 February 1975, the Director of Central Intelligence, William E. Colby, stated:

> Mr. Chairman:
> Our national intelligence agency, the CIA, is the object of great attention and concern. A series of serious allegations have been made by the press and other critics about our operations and activities.
> At the same time, a number of responsible Americans are concerned that a degree of hysteria can develop that will result in serious damage to our country's essential intelligence work by throwing the baby out with the bath water.
> There is equally serious concern within the CIA itself as to whether its personnel can continue to make their important contribution to our country or will be the target of ex post facto sensationalism and recrimination for actions taken at earlier times under a different atmosphere than today's.
> I welcome this opportunity to describe the importance of our intelligence, how it works

publicity can only be described as massive and concentrated. The prevailing atmosphere was such that some Congressmen even expressed concern that circumspect congressional investigation of the agency's activities was possible under the circumstances. Nevertheless, during this period no less than six congressional committees and one presidential commission undertook formal investigations of alleged Agency abuses. Many of the congressional hearings were televised.

and what it does, and the small extent to which its activities may in past years have come close to or even overstepped proper bounds. We certainly make no claim that nothing improper occurred, but we do think it important that such incidents be given only their proper proportion.

It would perhaps be useful, Mr. Chairman, to start by reviewing some of the allegations made recently about the CIA.

The leading charge was that, in direct violation of its charter, CIA conducted a "massive illegal domestic intelligence operation" against the anti-Vietnam war and other dissident elements in recent years. In my testimony to the Senate Appropriations and Armed Services Committees, on 15 and 16 January, I flatly denied this allegation. I pointed out that CIA instead had conducted a counterintelligence operation directed at possible foreign links to American dissidents, under the authority of the National Security Act and the National Security Council Intelligence Directives which govern its activities and in response to Presidential concern over this possibility. Thus this operation was neither massive, illegal, nor domestic, as alleged.

The same allegations stated that "dozens of other illegal activities," including break-ins, wire tapping, and surreptitious inspection of mail, were undertaken by members of the CIA in the United States beginning in the 1950's. Again I reported to the Senate Appropriations and Armed Services Committees a few such activities that in fact occurred. I pointed out that most such actions were taken under the general charge of the National Security Act on the Director of Central Intelligence to protect intelligence sources and methods against unauthorized disclosure. Whether or not they were appropriate, there are very few institutions in or out of Government which in a 27-year history do not on occasion make a misstep, but in CIA's case such instances were few and far between and quite exceptional to the main thrust of its efforts.

Another allegation given prominence was apparently based on the statements of an anonymous source who claimed that, while employed by the CIA in New York in the late 60s and early 70s, "he and other CIA agents had also participated in telephone wiretaps and break-ins" in the New York area. As I told the journalist involved before the story was printed, it does not bear any relation to CIA's actual activities in that area. Nor can we identify any former employee who answers to the journalist's description of his source. I fear that the journalist has been the victim of what we in the intelligence trade call a fabricator.

Another published allegation was that CIA, through Agency-owned corporate structures organized to provide apparent sponsorship for its overseas operations, manages a "$200-million-a-year top-secret corporate empire" which could circumvent the will of Congress. This allegation is also false. CIA does maintain certain corporate support structures that are essential to conducting its operations and concealing CIA's role overseas. These activities are managed, however, in the most meticulous manner by CIA to ensure the safekeeping of the Government's investment, and to audit these activities to ensure that they stay within proper bounds.

One individual continues to give national prominence to an allegation that CIA was somehow more involved in Watergate and its cover-up than has been demonstrated publicly. His lack of credibility should cause the charge to fall of its own weight, but in addition I believe the extensive investigations made into this subject, and in particular the tapes most recently released, indicate that CIA's limited assistance in 1971 certainly had nothing to do with the Watergate in 1972, and that CIA was the institution that said "No" to the cover-up rather than be involved in it.

There are also a number of allegations of improper CIA relationships with domestic police forces. The facts are that CIA maintained friendly liaison relationships with a number of police forces for assistance in CIA's mission of investigating its applicants, contractors, and similar contacts. These relationships from time to time included various mutual courtesies which have been warped into allegations of improper CIA manipulation of these police forces for domestic purposes. These allegations are false. Since the 1973 legislation barring any CIA assistance to the Law Enforcement Assistance Administration, CIA has terminated any assistance to the LEAA and in compliance with the spirit as well as the letter of that particular law has terminated any assistance to local police forces as well.

For a detailed rebuttal of certain charges made in the media, see DCI Colby's testimony before the Senate Appropriations Committee, 15 January 1975.

It was in this climate that petitioners brought their suit against various present and former employees of the CIA and other federal agencies, seeking monetary damages in excess of $1 million for violation of their statutory and constitutional rights.[3] In the early stages of discovery, respondents learned that petitioners' counsel intended to stage a series of press conferences at which they would *selectively* make public portions of CIA documents they had obtained in discovery and would accompany these disclosures with interpretations of the documents and commentary on their significance. These press conferences were to be held on the behalf of two organizations which were not parties to the litigation, the American Civil Liberties Union and the Center for National Security Study. At this point, the respondents sought a protective order prohibiting petitioners and their counsel from staging these press conferences. They argued that the proposed extra-judicial use of the agency documents would prejudice their right to "adjudication of the issues . . . in an uncolored and unbiased climate".[4] Moreover, they pointed out that petitioners' proposed use of the discovered material violated the Local Rules of the District Court and the Disciplinary Rules of the Code of Professional Responsibility which prohibit extra-judicial statements, other than quotation from or reference to public records, if there is a reasonable likelihood that such dissemination would interfere with a fair trial.[5] The district judge granted the protective order.

3. Supplemental Appendix at 18–33.

4. Joint Appendix (J.A.) at 24.

5. Local Rule 1–27(d) of the Local Rules of the District Court of the District of Columbia expressly prohibits an attorney from

> . . . participat[ing] in making an extra-judicial statement [about evidence regarding the occurrence involved], other than a quotation from or reference to public records . . . if there is a reasonable likelihood that such dissemination will interfere with a fair trial.

In addition, the District of Columbia Court of Appeals has recently amended the Disciplinary Rules of the Code of Professional Responsibility, sections DR7–107(G) and (H). The amendment reads:

The majority decision vacating the District Court's protective order rests on three propositions. The first proposition is that the District Court's order is a prior restraint on expression which violates the First Amendment because it was not based on a specific factual finding that petitioner's disclosures would have posed a serious and imminent threat to the administration of justice.

The second proposition is that respondents failed to make a satisfactory showing of "good cause" for the protective order as required by Rule 26(c) of the Federal Rules of Civil Procedure and that hence the District Court abused its discretion in issuing the order.

The third proposition is that issuance of the order was such a *clear* abuse of discretion as to warrant mandamus. Not one of the three propositions is sustainable on precedent or on reason divorced from the passion of the moment.

## I. THE FIRST AMENDMENT

The majority views as an assault on the Bill of Rights a protective order issued by the District Court in its discretionary administration of pre-trial discovery pursuant to the Federal Rules of Civil Procedure. This constitutional claim is unwarranted by any of the cases which it cites, and is incompatible with some cases which it has unsuccessfully attempted to distinguish.

We do not in this case deal, as in *Near v. Minnesota*[6] or in *New York Times Co. v.*

> Newspaper publications by a lawyer as to pending or anticipated litigation may interfere with a fair trial in the Courts and otherwise prejudice the due administration of justice. Generally they are to be condemned. If the extreme circumstances of a particular case justify statement to the public, it is unprofessional to make it anonymously. An ex parte reference to the facts should not go beyond quotation from the records and papers on file in the court; but even in extreme cases it is better to avoid any ex parte statement.

6. 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

*United States,*[7] with an injunction seeking to restrain speech unrelated to judicial proceedings.

Nor do we confront, as in *Pennekamp v. Florida*[8] or in *Craig v. Harney,*[9] an attempt to punish or stifle extra-judicial criticism of a court's treatment of a case pending before it.

Nor do we even face, as in *Nebraska Press Ass'n v. Stuart*[10] or in *Chase v. Robson,*[11] so heavily relied upon by the majority, an effort to limit *any comment,* whatever its basis or provenance, concerning pending litigation or a phase thereof.

Rather, the protective order issued by Judge Green in this case is of a quite limited scope. (1) It is addressed only to the *immediate parties* and their counsel. (2) It is *limited in duration,* contemplating the public disclosure during trial of those documents which are admissible as evidence and the public disclosure after trial of those which are not.[12] (3) Most importantly, it concerns only information obtained through the court's own processes. There is no attempt to restrict the parties as to any general statements about the case, or any statements made on the basis of information or potential evidence gained by methods other than through the court's processes.

The constitutional propriety of such an order is plain. As Judge Friendly wrote for the Second Circuit in *International Products Corp. v. Koons*: [13]

> The portion of the order which seals the deposition of Seldes and limits defendants and others in their use of information obtained therefrom was plainly authorized by F.R.Civ.Proc. 30(b) [now

Rule 26(c)], and *we entertain no doubt as to the constitutionality of a rule allowing a federal court to forbid the publicizing, in advance of trial, of information obtained by one party from another by use of the court's processes.* Whether or not the Rule itself authorizes so much of the order as also seals all affidavits submitted by defendants on various motions, we have no question as to the court's jurisdiction to do this under the inherent 'equitable powers of courts of law over their own process, to prevent abuses, oppression, and injustices,' *Gumbel v. Pitkin,* 124 U.S. 131, 144, 8 S.Ct. 379, 31 L.Ed. 374 (1888); *Parker v. Columbia Broadcasting System, supra,* 320 F.2d at 938, or as to the propriety of the exercise of discretion here. Even though the affidavits were defendants' own productions, their quasi-official appearance might give them more weight with the uninformed than they were entitled to receive, and newspapers might feel freer to publish them, under the privilege to report judicial proceedings, than extra-judicial statements.

The order in *Koons,* which the Court of Appeals sustained insofar as it sealed a deposition and related papers, also purported to restrict the party's disclosure of certain information otherwise available to them. With respect to this latter provision, the Court of Appeals stated: [14]

> What causes concern here is that the order went further and curtailed disclosure of information and writings which defendants and their counsel possessed before they sought to take Seldes' deposition. We fail to see how the use of such documents or information in arguing motions can justify an order preventing de-

---

**7.** 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

**8.** 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946).

**9.** 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947).

**10.** 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).

**11.** 435 F.2d 1059 (7th Cir. 1970).

**12.** According to the terms of the order, the prohibition on disclosure remains in effect until modified or removed by the District Court. However, because the order is based on possible prejudice to a fair trial, it is likely that the prohibition on disclosure will be removed upon completion of the litigation.

**13.** 325 F.2d 403, 407–08 (2nd Cir. 1963).

**14.** 325 F.2d at 408.

fendants and their counsel from exercising their First Amendment rights to disclose such documents and information free of governmental restraint.

To the same effect is the more recent decision of the Third Circuit in *Rodgers v. United States Steel Corp.*[15] There, too, the court sustained against constitutional attack a protective order insofar as it barred a party's extra-judicial use of material it had obtained through compulsory discovery processes. But it struck down another provision of the order which attempted to limit the party's use of related information otherwise in its possession.

An analogous situation was also presented in *Parker v. Columbia Broadcasting System,*[16] a stockholder's suit in which plaintiff appealed from an order restraining her from publishing or disseminating an unsworn "memorandum" which plaintiff herself had filed with the court in support of her motion for judgment on the pleadings. The document contained allegations of fraud and misconduct by defendants and their counsel. The district court's restraining order also prohibited plaintiff from "communicating with any person or entity with respect" to "any of the matters contained therein." The Second Circuit upheld against constitutional challenge that portion of the order that restrained promulgation of the document itself: [17]

> Insofar as the order enjoins appellant from "in any way publishing, disseminating, publicizing or otherwise promulgating to any person or entity all or any portion of the document," we hold that, in view of the nature of the document, the order was properly issued under the inherent "equitable powers of courts of law over their own process, to prevent abuses, oppression, and injustice." (citations omitted).

> However, the order also enjoins appellant from communicating with any per-

son with regard to any "matters contained" in the memorandum. This part of the order is repugnant to the First Amendment to the Constitution . . . . (citations omitted).

Thus, *Koons, Rodgers*, and, inferentially, *Parker* all recognize a distinction between, on the one hand, restraining orders prohibiting the communication of other kinds of information, and, on the other hand, protective orders solely directed at information and documents obtained in discovery through the court's own processes. The distinction is this: Although each is a form of "prior restraint," the constitutional permissibility of the first order is determined by application of a rigorous "clear-and-present-danger" type standard, whereas the constitutional permissibility of the latter order is governed by the less stringent standards embodied in the discovery laws.

Examples of the first type of order appear in *Nebraska Press Ass'n v. Stuart, Chase v. Robson,* and *CBS, Inc. v. Young.*[18] The order in *Nebraska Press Ass'n* prohibited the press from reporting the existence or nature of any confessions or other information "strongly implicative" of an accused murderer. In *Chase,* the restraining order prohibited defendants and their attorneys from making any public statements concerning the jury, the witnesses, the evidence, the merits, and the court rulings in a pending criminal case. The restraining order in *CBS, Inc.* prohibited counsel, court personnel, the parties, and their relatives, friends, and associates from "discussing in any manner whatsoever these cases with members of the news media." These and similar cases articulate a rigorous standard for determining the permissibility of restraining orders of this type; they hold that such orders are permissible *only upon a clear showing that they are necessary to prevent a serious and imminent harm to the fair administration of justice.*[19]

---

**15.** 536 F.2d 1001 (3rd Cir. 1976).

**16.** 320 F.2d 937 (2nd Cir. 1963).

**17.** *Id.* at 938–39.

**18.** 522 F.2d 234 (6th Cir. 1975).

**19.** *CBS, Inc. v. Young,* 522 F.2d at 238, 241; *Chase v. Robson,* 435 F.2d at 1061; *Nebraska Press Ass'n v. Stuart,* 427 U.S. 569, 96 S.Ct.

Three features of this strict standard have been stressed: (1) insistence on an *exceedingly high probability*—bordering on certainty—that the harm predicted will materialize unless there is a prior restraint;[20] (2) insistence that the *harm predicted be serious and irreparable* and that the competing *interests at stake be substantial*, at least approaching in dignity the First Amendment interests sought to be curtailed;[21] and (3) insistence that the courts make formal and specific *factual findings* and articulate these findings in some detail.[22]

Protective orders of the second type—that is, orders that are directed solely at the protection and control of discovered documents—also constitute a form of "prior restraint." However, the standard applied in determining the permissibility of this type of order *is not* the rigorous standard set forth in the *Nebraska Press Ass'n, Chase,* and *CBS, Inc.* cases. Rather, the applicable standard is to be found in Rule 26(c) of the Federal Rules of Civil Procedure which provides:

(c) Protective Orders. Upon motion by a party or by the person from whom discovery is sought, and *for good cause shown*, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the district where the deposition is to be taken may make *any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense*, including one or more of the following:

(1) that the discovery not be had; (2) *that the discovery may be had only on specified terms and conditions*, including a designation of the time or place; (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery; (4) that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters; (5) *that discovery be conducted with no one present except persons designated by the court;* (6) *that a deposition after being sealed be opened only by order of the court;* (7) *that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way*; (8) that the parties simultaneously file specified documents or information enclosed in sealed envelopes to be opened as directed by the court.

If the motion for a protective order is denied in whole or in part, the court may, on such terms and conditions as are just, order that any party or person provide or permit discovery. The provisions of Rule 37(a)(4) apply to the award of expenses incurred in relation to the motion.

As long as a protective order meets the "good cause shown" standard embodied in Rule 26(c), it abridges no First Amendment rights; to the extent that such an order works a "prior restraint," such a restraint is permissible under the First Amendment.

It is evident from the language of Rule 26(c), from the *Koons* case, and from a distillation of the numerous protective order cases arising under Rule 26(c), that the

2791; *id.* at 571, 96 S.Ct. 2791 (Powell, J., concurring).

**20.** *See Nebraska Press Ass'n v. Stuart*, 427 U.S. at 569–70, 96 S.Ct. 2791; *CBS, Inc. v. Young*, 522 F.2d at 238, 241; *Chase v. Robson*, 435 F.2d at 1061. *See also New York Times Co. v. United States*, 403 U.S. 713, 726 27, 91 S.Ct. 2140 (1971) (Brennan, J., concurring); *id.* at 730, 91 S.Ct. 2140 (Stewart, J., joined by White, J., concurring).

**21.** *See Nebraska Press Ass'n v. Stuart*, 427 U.S. at 551, 561, 96 S.Ct. 2791; *id.* at 590 91, 96 S.Ct. at 2791 (Brennan, J., concurring); *New*

York Times Co. v. United States, 403 U.S. at 725 26, 91 S.Ct. 2140 (Brennan, J., concurring); *id.* at 730, 91 S.Ct. 2140 (Stewart, J., joined by White, J., concurring); *id.* at 731–33, 91 S.Ct. 2140 (White, J., joined by Stewart, J., concurring); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419–20, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); *CBS, Inc. v. Young*, 522 F.2d at 238.

**22.** *See Nebraska Press Ass'n v. Stuart*, 427 U.S. at 569, 96 S.Ct. 2791; *id.* at 571, 96 S.Ct. 2791 (Powell, J., concurring); *Chase v. Robson*, 435 F.2d at 1061.

"good cause shown" standard in Rule 26(c) is less stringent than the standard set forth in *Nebraska Press Ass'n* and the other cases dealing with broad restraining orders. First, in order to obtain a protective order under Rule 26(c), it is not necessary to demonstrate the same *exceedingly high* probability of harm that may be needed to justify broader restraining orders. It may be enough to show that the predicted harm is reasonably likely to occur unless a protective order is issued.[23] Second, it is not necessary in order to obtain a protective order under Rule 26(c) to show the same degree of serious and irreparable harm called for under the *Nebraska Press Ass'n* standard. Less crippling harm may do.[24] Nor is it necessary under Rule 26(c) to invoke the same quality of competing interest demanded by the *Nebraska Press Ass'n* standard. Somewhat more mundane interests are cognizable; for example, an order may issue to protect business information or even to protect against personal embarrassment.[25] Third, it is not necessary for district courts to make the same kind of formal and specific factual findings or to articulate these findings as elaborately as has been required under the *Nebraska Press Ass'n* line of cases. The district court's decision under Rule 26(c) is discretionary and involves the balancing of various competing interests; it is enough that the district court provide a record sufficient for meaningful review.[26]

In sum, then, I submit (1) that in order to pass constitutional muster a protective order that is directed only at controlling the use of discovery materials need only comport with the standards embodied in Rule 26(c) and (2) that these standards are somewhat less stringent than the "clear and present danger" type test set forth in cases dealing with broader restraining orders.

Why should these different types of restraining orders be treated differently? Why should a lower standard govern the permissibility of protective orders directed solely at discovery materials, while a higher standard governs the permissibility of broader restraining orders? The answer lies in the quantitative and qualitative differences between the First Amendment interests of a person seeking to disseminate discovery materials and one seeking to disseminate other kinds of information. The First Amendment interests of litigants in the promulgation of materials exacted from another party through the compulsory processes of the courts are much more limited and of a fundamentally different character from the First Amendment interests of litigants and nonlitigants in the public communication of other information concerning judicial proceedings. This is because litigants who wish to disseminate discovery materials have gained access to such materials—access which they would not ordinarily have—through a statutory system that expressly reserves to the courts the power to attach restrictions on the use of such materials. Thus, when litigants receive discovery materials, they receive them already *subject to* the courts' exercise of this discretionary power. The First Amendment interest of litigants in the dissemination of this material is, therefore, limited: It is necessarily qualified or conditioned by the potential restrictions that are part of the system through which the materials have been obtained.

The majority contends that this analysis "confuses plaintiffs' right of access to materials with restraints imposed on materials after they have been obtained."[27] If there is confusion, it is the majority's. I do not believe that it is logical or legally sound to view the magnitude of one's right to dispose of information once it has been obtained

---

**23.** *See International Products Corp. v. Koons,* 325 F.2d at 405, 405 n.2, 408.

**24.** *See id.*

**25.** *See id.; Essex Wire Corp. v. Eastern Elec. Sales Co.,* 48 F.R.D. 308 (E.D.Pa.1969) (business interests); *Nichols v. Philadelphia Tribune*

Co., 22 F.R.D. 89 (E.D.Pa.1958) (personal embarrassment).

**26.** *See* cases cited at note 25.

**27.** Maj. Op. at · of 194 U.S.App.D.C., at 190 of 598 F.2d.

wholly apart from explicit restrictions on use that are imposed by the same statutory system that granted access to the information in the first place. The majority suggests that "[a] prohibition on what plaintiffs may say about information once they have obtained it . . . directly implicates the First Amendment." [28] I would agree; but I would submit further that the magnitude of those concerns may in large part be determined by limitations in the statute which conferred on plaintiffs the right of access to the information. My view that a recipient of discovery materials has no more than a conditional interest in those materials is thus very analogous to the view taken by Mr. Justice Rehnquist in *Arnett v. Kennedy* with respect to one's property interest in a government job. Therein Mr. Justice Rehnquist concluded that "the property interest which appellee had in his [nonprobationary federal] employment was itself conditioned by the procedural limitations which had accompanied the grant of that interest." [29]

It must be remembered that plaintiffs would have no right of access to the materials in this case in the absence of some statutory entitlement.[30] The discovery laws embodied in the Federal Rules of Civil Procedure confer on plaintiffs, as litigants, a right of access. These rules provide for very broad access to materials and information. However, while the scope of discovery is broad, its purpose is narrow. It is designed specifically to facilitate the fair trial of issues between parties. It has three distinct purposes: (1) to narrow the issues, in order that *at trial* it may be necessary to produce evidence only on matters actually in dispute; (2) to obtain evidence *for use at trial*; and (3) to secure information about the existence of evidence that *may be used at trial.*[31]

The broad scope of discovery permitted under the Federal Rules of Civil Procedure raises the danger of abuse. As one authority notes:

> Liberal discovery procedures are an important advance in the litigation process but it cannot be thought that they are an unmixed blessing. Any device, however salutary, can be abused and there are undoubtedly instances in which a party will seek to use discovery in a way that will oppress his opponent. . . .[32]

In order to protect against potential abuse of discovery, the Federal Rules of Civil Procedure expressly confer on the courts broad discretionary power to issue orders for the protection of parties and persons from whom discovery is being sought. They authorize courts to impose conditions on a litigant's access to information, and these conditions may be placed *before or after* the litigant's receipt of information. The rules explicitly authorize courts to issue protective orders restricting the dissemination of discovery materials.

In short, the power of the courts to place conditions on discovery is an integral part of the scheme of discovery as a whole; it is a corollary to the broad right of access that litigants have under the laws, and the ability of the court to issue such orders is important to the overall fairness of the discovery process. A leading commentator observes:

> Rule 26(c) [authorizing the issuance of protective orders] was adopted as a safeguard for the protection of parties and witnesses in view of the almost unlimited right of discovery given by Rule 26(b). *The provision emphasizes the complete control that the court has over the discovery process.*

But plaintiffs have not done so and rely exclusively on their rights under the discovery laws.

---

**28.** Maj. Op. at of 194 U.S.App.D.C., at 190 of 598 F.2d.

**29.** *Cf. Arnett v. Kennedy,* 416 U.S. 134, 155, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Rehnquist, J., joined by Burger, C. J., and Stewart, J.).

**30.** Presumably, plaintiffs could also obtain these materials through the FOIA, in which case this controversy would not have arisen.

**31.** *See generally* 8 Wright & Miller, Federal Practice and Procedure: Civil § 2001 (1st ed. 1970).

**32.** Wright, Federal Courts § 83 at 412 (3rd ed. 1976).

It is impossible to set out in a rule all of the circumstances that may require limitations on discovery or the kinds of limitations that may be needed. The rules, instead, permit the broadest scope of discovery and leave it to the enlightened discretion of the district court to decide what restrictions may be necessary to a particular case.[33]

Within the framework of the discovery laws, then, it is clear that whatever rights a party may have in the materials that it has exacted from another party in discovery are qualified by conditions properly imposed by the court in its discretion under Rule 26(c). There is no "waiver" of First Amendment rights, as the majority tries to term it; it is simply that when a party uses the court's process in a manner which may be unfair to the other party and is unrelated to the litigation purpose of discovery, the court has the power and responsibility to take whatever action is necessary to protect its process from abuse, and a protective order requiring a litigant to use the products of discovery in a manner consistent with the purposes of discovery is a permissible "prior restraint" if it meets the standards set forth in Rule 26(c).[34]

The majority argues that revelation of governmental action which sometimes accompanies civil litigation should not be kept from the public.[35] Of course, this material on which petitioners wish to hold a press conference now *will* be made public—at the trial. Even matter which has been discovered, but which may not be deemed relevant to issues at trial, can later be fully disclosed and discussed, as I understand the purpose and tenor of the trial court's order. No suppression of free speech is involved in this case; what is at issue is the orderly control of the judicial process by the trial judge.[36]

This is illustrated by the striking anomaly in the majority opinion's logic which the majority does not adequately explain. It is conceded "that plaintiffs do not have a First Amendment right of access to information not generally available to members of the public. *Pell v. Procunier,* 417 U.S. 817, 834, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Zemel v. Rusk,* 381 U.S. 1, 16–17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *see also Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 609 10, 98 S.Ct. 1306 [1318], 55 L.Ed.2d 570 (1978)."[37] Federal Rule of Civil Procedure 26(c)(1) allows the district court to prevent discovery altogether, if

---

**33.** 8 Wright & Miller, Federal Practice and Procedure: Civil § 2036 at 267–68 (1st ed. 1970).

**34.** Congress could have adopted discovery laws that completely prohibited the extra-judicial use and dissemination of discovery materials, and such a statutory limitation would undoubtedly have been constitutional. At the other extreme, Congress could have adopted discovery laws that mandated the public dissemination of discovery materials (unless dissemination clearly violated a party's constitutional rights). Congress did not choose either extreme, however; it adopted the middle course. There are no explicit restrictions on extra-judicial use of discovery materials, but a court has the discretionary power and responsibility to impose such restrictions where a party demonstrates to the court's satisfaction that there is a palpable risk of injury to a somewhat significant interest.

This "middle approach," by its very nature, "takes into account" First Amendment interests by placing both the burden of production and the burden of persuasion on the party seeking a protective order.

It is clear that Congress, having imposed those burdens, can define their magnitude. If it would be constitutional for Congress to prohibit completely the extra-judicial use of discovery materials, then it is constitutional for Congress to define those burdens in modest terms—less exacting and absolute than those urged by the majority.

Thus the statement by the majority, "The discovery Rules themselves place no limitations on what a party may do with materials obtained in discovery" (Maj. Op. of 194 U.S.App. D.C., at 188 of 598 F.2d), is somewhat misleading. The control of all discovery, its extent and use, including pre-trial restrictions, has been left to the trial court.

**35.** Maj. Op. at of 194 U.S.App.D.C., at 182 of 598 F.2d.

**36.** The majority is frank to admit that the documents obtained under Rule 34 are not yet part of the "public record" in this case. Maj. Op., note 28.

**37.** Maj. Op. at of 194 U.S.App.D.C., at 190 of 598 F.2d.

good cause is shown ("may . . . order . . . that the discovery not be had"). No one argues that such prohibition raises any First Amendment issues or problems, and apparently it is conceded by all that such an order may be based on mere "good cause," and the district court need not meet any more stringent test such as "reasonable likelihood of harm" or "serious and imminent threat," etc., before it can issue such an order. However, the majority holds that when a *less serious* intrusion of the district court is made, *i. e.,* it attempts to set limits on the use of the information already received, it must meet *more stringent* First Amendment standards.

Thus the anomalous situation results, in which the district court is completely unfettered by First Amendment considerations when it is most intrusive, *i. e.,* prohibits discovery altogether, and is more restricted when it is less intrusive, *i. e.,* puts limits on the use of material which it allows to be discovered. This has nothing to do with any "benefits-privileges" analysis, as the majority interprets my position (note 28). It is simply the principle that the greater (the power to prohibit altogether) includes the lesser (the power to grant with conditions), a bit of logic which has been recognized as valid at least since the ancient Greeks.

It seems to me, then, that the majority's elaborate First Amendment analysis is gratuitous. Since an order properly issued under Rule 26(c) is constitutional, the focus of inquiry should be whether or not "good cause" has been shown for the order under review within the meaning of Rule 26(c). If the district court properly issued the order under Rule 26(c), then the order is consistent with First Amendment safeguards, and there is no reason to embark on an independent First Amendment analysis. If the district court did not properly issue the order under Rule 26(c), then it is violative of statutory standards, and there is again no reason to embark on a First Amendment analysis.

## II. "GOOD CAUSE SHOWN" UNDER RULE 26(c)

Under Rule 26(c) of the Federal Rules of Civil Procedure the moving party must show "good cause" for a protective order. The majority finds that respondents' showing was insufficient—indeed, that it was so deficient that the District Court *clearly* abused its discretion in acting upon it. Actually, however, the real gravamen of the majority's censure is not the inadequacy of the showing *made to the court,* but, rather, the inadequacy of the findings *made by the court* on the basis of the data before it. The majority believes that the court was required to preface the order with elaborate and detailed factual findings. However, such findings are *not* required under Rule 26(c), and, as I have already discussed, the majority's insistence on such findings is based on an erroneous belief that orders under Rule 26(c) must satisfy not only the "good cause shown" standard incorporated therein but also the more rigorous standards set forth in cases dealing with broader restraining orders unrelated to the discovery process.

The majority's disposition of this matter raises two areas of inquiry. First, what kind of showing were respondents required to make to establish "good cause" under Rule 26(c)? Second, was the showing actually made by respondents adequate?

### A. *The Kind of Showing Required*

According to a leading treatise, in order to establish "good cause," a moving party must make "a particular and specific demonstration of fact." [38]

The first line of cases are district court cases in which trial judges have resisted parties' attempts to limit their opponents' discovery by making general and conclusory objections.[39] Typical of the kinds of general objections found unsatisfactory in these

**38.** 8 Wright & Miller, Federal Practice and Procedure 265 (1st ed. 1970).

**39.** *See, e. g., Bowles v. Safeway Stores,* 4 F.R.D. 469 (1945); *Essex Wire Corp. v. Eastern Elec. Sales Co.,* 48 F.R.D. 308 (1969).

cases are unsupported claims by one party that particular discovery by the other party would be burdensome, or inconvenient, or vexatious.[40] For example, as one district judge stated: [41]

> Objections to interrogatories should be sufficiently specific to the end that the Court may in considering such objections with the interrogatory propounded, ascertain therefrom their claimed objectionable character; that is, whether the interrogatory calls for matter that is relevant to the subject matter involved in the pending action, is privileged, or oppressive or vexatious. General objections to interrogatories are not proper.

The second line of cases are court of appeals cases reviewing a district judge's *denial* of a protective order. These cases hold that the district judge has not abused his discretion in denying a protective order where the moving party has made no specific showing of good cause.[42] In *White v. Wirtz*,[43] for example, defendants asserted that answering certain interrogatories propounded by plaintiffs would be an "undue burden and expense." Defendants provided no support for this assertion. The trial judge denied a protective order. The court of appeals held that the trial judge had broad discretion relating to protective orders and that, in view of defendants' conclusory and unsupported statements as to burden, he had not abused his discretion in denying the order.[44] There is little support in these precedents for a rule that a court clearly abuses its discretion unless it insists in every case on a highly specific and particular factual demonstration. Actually, moving parties under Rule 26(c) are not

held to any invariable standard of particularity in demonstrating "good cause." In each case, the determination as to whether "good cause" had been demonstrated is committed to the sound discretion of the trial court.[45]

The trial court has broad discretion under Rule 26(c) precisely because the appropriateness of a protective order involves the *ad hoc* balancing of competing interests. On the one hand, there is the general judicial interest in broad and open discovery. This militates against protective intervention by the court. On the other hand, there are the specific interests raised by the moving party as grounds for protective intervention. All that is required by the "good cause" requirement of Rule 26(c) in terms of the specificity of the showing is that the moving party provide the court with information sufficient to enable it meaningfully to balance the moving party's interests against the opposing party's interests. This means that the court must have before it enough information for it to ascertain the nature and magnitude of the moving party's interests.

The degree of specificity with which this information must be brought to the court's attention varies from case to case. For example, the kind of showing necessary to constitute "good cause" depends in each case upon the kind of protective order sought.[46] The burden is heaviest on the moving party where the order sought would restrict the scope of discovery itself and therefore could adversely affect the other party's ability to conduct the litigation.[47] In contrast, there is less of a burden on the moving party where the order sought con-

---

**40.** Id.

**41.** *Bowles v. Safeway Stores*, 4 F.R.D. at 470.

**42.** *See, e. g., White v. Wirtz*, 402 F.2d 145 (10th Cir. 1968); *General Dynamics Corp. v. Selb*, 481 F.2d 1204 (8th Cir. 1973).

**43.** 402 F.2d 145 (10th Cir. 1968).

**44.** 402 F.2d at 148.

**45.** *See, e. g., U. S. ex rel. Edelstein v. Brussell Sewing*, 3 F.R.D. 87 (D.C.N.Y.1943); *Chemical & Indus. Corp. v. Druffel*, 301 F.2d 126, 129

(6th Cir. 1962); *Galella v. Onassis*, 487 F.2d 986 (2nd Cir. 1973).

**46.** *See generally* 4 Moore's Federal Practice §§ 26.68–26.78.

**47.** *See, e. g., Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975); *Kamin v. Central States Fire Ins. Co.*, 22 F.R.D. 220 (E.D.N.Y. 1958); *Traejon Bristle Mfg. Co. v. Omnex Corp.*, 13 F.R.D. 448 (S.D.N.Y.). *See generally* 4 Moore's Federal Practice § 26.69.

cerns only the extra-judicial use of discovered materials and hence would affect in no way the ability of the other party to litigate.[48]

It is important to note, then, that in the instant case the *protective order sought does not place any restrictions on discovery itself; it only prevents an extra-judicial use of discovered materials wholly unrelated to the conduct of the litigation.* Thus, the order does not entail any potential prejudice to the litigation rights of petitioners. Consequently, while respondents were still required to show "good cause", they were not required to do so with the degree of specificity and particularity that might otherwise have been required by the district judge.

Moreover, the kind of showing needed to constitute "good cause" necessarily depends in each case upon the type of harm with which the movant is threatened. Some kinds of harm are capable of clear objective demonstration. For example, a moving party can easily demonstrate with particularity that certain materials are "trade secrets" or that a particular oral deposition would entail great inconvenience. However, other kinds of harm are more subtle and less amenable to objective demonstration. Annoyance, embarrassment, and harassment are proper grounds for protective orders but are relatively difficult to demonstrate with particularity. This does not mean that these more subtle injuries pose any less of a threat to the moving party. Indeed, it may mean that more subtle abuses of discovery are occurring, and this is all the more reason for trial judges to be sensitive to these kinds of dangers.

In sum, then, the relative specificity of a particular showing under Rule 26(c) is not determinative of the showing's adequacy. The inquiry is whether the court has before it information from which it can reasonably conclude that the nature and magnitude of the moving party's interest are such that protective intervention by the court is justified.

One further point on the kind of showing required: The logic of the majority has virtually read out *any* kind of a showing under Rule 26(c) as adequate support for a trial court's protective order. Fed.R.Civ.P. 26(c) provides that the district court may "make *any order* which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." I would submit, first that the majority has read out of the Rule the word "any" before the word "order," and has also read out of Rule 26(c), to a large extent, the words "annoyance, embarrassment, oppression, or undue burden or expense" as a valid ground for such an order. It is hard to conceive of a situation where the majority would allow such interests as annoyance, embarrassment, etc., to outweigh the "overriding" interests in First Amendment expression asserted to be present.

This Rule of Civil Procedure is thus left with no content: if public disclosure which would be "prejudicial to the defendants' right to adjudication of this civil action in an uncolored and unbiased climate, including a fair trial" is not sufficient within the above-quoted language of Rule 26(c), what is? We must not overlook the fact that drafters of the Rule, which comes to us with the imprimatur of the Supreme Court, must have realized that any grounds of a protective order, if successfully invoked, would have the effect of "overriding" free speech—in the same distorted sense as used by the majority here.

B. *The Adequacy of Respondent's Showing*

In the instant case, respondents sought a protective order on the grounds that petitioners' public release of discovered materials would likely aggravate an already hostile climate of public opinion developing toward respondents and thereby interfere with the prospects for a fair trial on the issues. It is clear from the record that

---

**48.** *See* 4 Moore's Federal Practice §§ 26.70, 26.73, 26.74, 26.75; 8 Wright & Miller, Federal

Practice and Procedure: Civil §§ 2038, 2041 (1st ed. 1970).

there was sufficient information before the District Court to satisfy the "good cause" requirement of Rule 26(c).

The court had before it the fact that the subject matter of petitioners' claims had already generated massive, and in many cases possibly tendentious, publicity. From this the court could reasonably conclude that it had before it a case likely to attract sensational news coverage, particularly if any encouragement were given. In addition, respondents brought to the attention of the court, in their motion for a protective order, the fact that counsel for petitioners was planning to stage a series of press conferences at which *selected* portions of Agency documents obtained through discovery were to be released and interpreted for the media. *The fact that release of information was to be selective is in itself significant. It obviously increases the danger that information will be taken out of context, and it suggests an intent to manipulate public opinion* in regard to the pending judicial proceeding. If petitioners were motivated by a disinterested desire to educate the populace generally, they would have planned to release *all* of the documents and let them speak for themselves. It is true that respondents did not provide any objective demonstration concerning the *extent* to which prospective publicity would interfere with a fair trial. However, this is something which is virtually impossible to demonstrate objectively. Nevertheless, the court had before it the data of its own experience in dealing with press coverage of trials, and in exercising its discretion the court is expected to rely on its experience in making judgments.

Finally, the court also had brought to its attention by respondents *the strong judicial policy against extra-judicial statements by counsel concerning pending litigation,*[49] a point to which the majority seems to give no weight whatsoever. After all, a court is still a place of order and fair procedure, and the rule against extra-judicial statements is an important underpinning.

On the basis of all of this information, it was reasonable for the District Court to conclude, as it did, that petitioners' proposed press conferences could well interfere with a fair trial by exacerbating the already hostile climate of opinion toward respondents that had developed. It was, therefore, reasonable for the court to conclude that sufficient cause had been shown to warrant issuance of a limited protective order.

The majority does raise at least two specific objections to the factual basis upon which the District Court acted. First, it complains that the record is devoid of evidence that this is the kind of sensational case which is likely to generate massive and concentrated publicity. As already noted, this is not entirely true. The court had before it the fact that the subject matter of petitioners' claims had already generated massive publicity. Furthermore, this factor largely was in the control of petitioners and depended upon petitioners' success in manipulating public opinion. Under these circumstances, it is difficult to see how any further evidence could have been adduced by respondents to demonstrate that the case would attract a great deal of press attention.

Second, and finally, the majority complains that the District Court took no account of the fact that the case was to be tried by a judge rather than a jury. While there is no indication that the district judge ignored this fact, and while it is relevant, it does not make groundless the judge's concern that massive adverse publicity could well interfere with a fair trial. Prejudicial public disclosure can have a detrimental effect on the court in a bench trial. "Judges are human",[50] and even the most

---

**49.** As the First Circuit has recently stated, the proper function of an attorney is

> . . . to present his case in the courtroom, not to make extrajudicial statements interpreting or explaining the evidence, anticipating his own or his adversary's strategy,

or attempting to build a favorable climate or opinion.

*United States v. Coast of Maine Lobster Co.,* 538 F.2d 899, 901–02 (1st Cir. 1976).

**50.** *Chicago Council of Lawyers v. Bauer,* 522 F.2d 242, 256–57 (7th Cir. 1975).

austere intellect among them can be affected—one way or another—by a highly charged climate of opinion. Conduct of a trial can yet be influenced in other ways. Witnesses, for example, may be affected by a highly charged atmosphere. Moreover, suits such as this have frequently employed advisory juries under Rule 39 of the Federal Rules of Civil Procedure. A prejudiced climate of opinion would make it difficult for a judge to employ this technique.

In sum, then, the District Court acted well within its discretion in entering a narrowly drawn order to minimize the prejudicial effect of pretrial publicity and to prevent parties from abusing the judicial process by seeking discovery for non-litigation purposes.

## III. THE INAPPROPRIATENESS OF MANDAMUS

Traditionally, mandamus has only been proper where the action of the district court amounted to a clear abuse of discretion or usurpation of judicial power.[51] However, recently both the Supreme Court and this court have recognized that mandamus should also be available in limited circumstances for supervisory or advisory purposes.[52] But regardless of the type of mandamus involved—traditional, supervisory, or advisory—the availability of the writ is independent of the existence of error in the trial court's ruling:[53]

**51.** *Bankers Life & Cas. Co. v. Holland,* 346 U.S. 379, 383, 74 S.Ct. 145, 98 L.Ed. 106 (1953).

**52.** *See generally Schlagenhauf v. Holder,* 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964); *Colonial Times, Inc. v. Gasch,* 166 U.S.App. D.C. 184, 509 F.2d 517 (1975); 9 Moore's Federal Practice ⸙ 110.26 at 287 (2d ed. J. Moore & B. Ward 1973).

**53.** *Will v. United States,* 389 U.S. 90, 104, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967).

**54.** Maj. Op. at ___ of 194 U.S.App.D.C., at 198 of 598 F.2d. The majority does not contend that either advisory or supervisory mandamus would be appropriate in this case. It is clear that neither are available. The supervisory writ is not appropriate unless the district court has shown a ". . . persistent or deliberate disregard of limiting rules . . . ." *National Right to Work Legal Defense v. Richey,* 167

Mandamus, it must be remembered, does not "run the gauntlet of reversible errors." *Bankers Life & Cas. Co. v. Holland,* 346 U.S. 379, 382, 74 S.Ct. 145, 98 L.Ed. 106 (1953). Its office is not to "control the decision of the trial court," but rather merely to confine the lower court to the sphere of its discretionary power.

The majority claims that mandamus is appropriate in the *traditional* sense—that the District Court's entry of the protective order was a clear abuse of its discretion.[54] This is so, the majority contends, because the protective order was not based on a specific factual showing of serious and imminent danger to the fair administration of justice.

I have already demonstrated in Part I of this dissent that this constitutional claim is without merit. The "clear and present danger" standard urged by the majority is inapposite in this context. Protective orders such as the one issued here are permissible prior restraints so long as they are based on "good cause shown" as required in Rule 26(c). Furthermore, even if there were some merit in this constitutional claim, this would not necessarily entitle petitioner to mandamus. This court has previously recognized that discovery orders which allegedly violate constitutional rights are not appealable at least prior to entry of an order of contempt.[55]

U.S.App.D.C. 18, 22, 510 F.2d 1239, 1243 (1975). Advisory mandamus is available only where the decision will clarify a question "that is likely to confront a number of lower court judges in a number of suits before appellate review is possible . . . ." *Id.,* at 22, 510 F.2d at 1243 [citations omitted].

**55.** *See United States v. Anderson,* 464 F.2d 1390, 1392 (D.C.Cir. 1972); *National Right to Work Legal Defense v. Richey,* 167 U.S.App. D.C. 18, 24, 510 F.2d 1239, 1245 (1975). *See also Central South Carolina Chapter, Society of Professional Journalists v. District Court,* 551 F.2d 559 (4th Cir. 1977), wherein the district court entered an order prior to a criminal trial regulating the conduct of the participants in the trial and the conduct and seating of the press in the courtroom. The order prohibited participants in the trial, including lawyers, parties, witnesses, jurors, and court officials from mak-

Nor would mandamus be appropriate on the ground that there has been an inadequate showing of "good cause" under Rule 26(c). The majority cannot claim that the District Court exceeded its power or *clearly* abused its discretion simply by entering (in its view) an erroneous order, *for to do so would be to validate unrestricted interlocutory review.* This theory was expressly rejected by the Supreme Court: [56]

> Acceptance of this semantic fallacy would undermine the settled limitations upon the power of an appellate court to review interlocutory orders. . . . Courts faced with petitions for the peremptory writs must be careful lest they suffer themselves to be misled by labels such as "abuse of discretion" and "want of power" into interlocutory review of nonappealable orders on the mere ground that they may be erroneous.

As I have already discussed in Part II of this dissent, the District Court acted well within its discretion in issuing the protective order. Not only was there a local rule which expressly provided restrictions on counsel in this situation, but the court also had before it the proposed press statements and petitioners' avowed intention to continue publicizing selected documents and their "interpretations" thereof. Moreover, the court was cognizant of the fact that the subject matter of petitioners' claims had already generated massive press coverage and that a hostile climate of public opinion was developing toward respondents' agencies. Confronted with these circumstances, it cannot be said that entry of the protective order to preserve the right of fair trial constituted a *clear* abuse of discretion.

Indeed few courts have granted writs against discovery orders on the ground that the orders involved clear abuses of discretion. The cases in which this has been done have most commonly involved the most blatant kind of error [57] and orders either *shutting off discovery* of important aspects of petitioners' case [58] or *permitting broad, intrusive and unnecessary discovery.*[59] None of these circumstances is present in this case.

It is also important to note that this is not a case where the petitioners lack any adequate means of appellate review. As

---

ing "extrajudicial statements which might divulge prejudicial matter not of public record," and from "mingling with or being in proximity" to reporters and photographers in the environs of the court. It prohibited the release of names and addresses of prospective jurors, and the sketching or photographing of jurors within the environs of the court. It prohibited witnesses from news interviews during the trial period. The Fourth Circuit concluded that it would be improper to grant relief from this order on a petition for mandamus:

> The order issued by the district judge was a result of his judgment that it was necessary to protect the defendant's right to a fair trial. We do not reach the merits of the order and we express no opinion concerning its validity. We note only that it involved the exercise of judgment by the district court on a question not nearly conclusively settled in law, especially adversely to the opinion of the district court, that is, whether rather than prohibiting the press from publishing information already obtained, *which the district court did not do, and which may only be done in extraordinary circumstances* not shown to be present here, it may indirectly prevent the press from obtaining information by regulating trial procedures and ordering the trial participants not to speak with members of the press.
>
> In view of *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 1791, 49 L.Ed.2d 683 (1976), and *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1973), the Society's right to relief from the order is far from clear and indisputable. Even considering abuse of discretion to be the standard, that has not been shown. Thus, we do not grant relief on the petition for mandamus.

*Id.* at 561.

56. *Will v. United States,* 389 U.S. at 98 n. 6, 88 S.Ct. at 275 n. 6; *see also Bankers Life & Cas. Co. v. Holland,* 346 U.S. at 383, 74 S.Ct. 145.

57. *See, e. g., Winters v. Travis,* 495 F.2d 839 (2nd Cir. 1974).

58. *See, e. g., Investment Properties Int'l, Ltd. v. IOS, Ltd.,* 459 F.2d 705 (2nd Cir. 1972); *Western Elec. Co. v. Stern,* 544 F.2d 1196, 1198–99 (3rd Cir. 1976).

59. *See, e. g., U. S. Bd. of Parole v. Merhige,* 487 F.2d 25 (4th Cir. 1973), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2625, 41 L.Ed.2d 224.

this court stated in *National Right to Work Legal Defense v. Richey:* " . . . [M]andamus is neither necessary nor appropriate in the instant case since the order may be challenged through disobedience."[60] And " . . . this principle extends even to the assertion of constitutional privilege."[61] Thus in three recent court of appeals decisions, First Amendment interests of association, claimed as a shield against compelled revelation of association membership, have been found insufficient grounds to review the merits of discovery orders because of the availability of appeal by way of disobedience and contempt.[62]

Finally, an important consideration in determining the appropriateness of mandamus is whether petitioner will be able to secure effective relief after final judgment. Many cases allowing interlocutory appeal from discovery orders through mandamus have done so in situations where failure to act immediately would result in *permanent, irreparable* damage to petitioner. Thus, mandamus is apt to be found appropriate to review orders that compel discovery of information that is claimed to be protected by the Constitution,[63] privilege,[64] or more general interests in secrecy.[65] The rationale of these cases has been that once petitioner is compelled to reveal the confidential information, it becomes impossible to provide effective relief in the future; *permanent* damage has been done.

Mandamus is not justified here because the challenged protective order is of such limited scope that petitioners' claims will soon be resolved in the course of the trial itself, and to the extent that they are not resolved, they will come to us as a redressable claim on appeal after trial. To the extent that the documents covered by the protective order are offered as evidence during trial and are received into the record, they will become public, and the parties can bleat about them to their hearts' content. Thus, to the extent that the documents are admitted into evidence, the controversy will have worked itself out by the time the trial is over, without any mandamus from us. Moreover, the controversy will probably not survive even as to those documents which are not offered or received into evidence. Since the sole basis for the order is possible prejudice to respondents, it will probably be vacated at the close of litigation. At that point petitioners will be free to disclose publicly any remaining documents. If, however, any restrictions are retained, this court will be able to satisfy petitioners' claims on appeal.

I respectfully dissent.

**60.** 167 U.S.App.D.C. at 24, 510 F.2d at 1245. *See also United States v. Ryan,* 402 U.S. 530, 533, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971).

**61.** *Ibid., citing United States v. Anderson,* 462 F.2d 1390 (1972).

**62.** *Grinnell Corp. v. Hackett,* 519 F.2d 595, 598–99 (1st Cir. 1975); *Dow Chemical Co. v. Taylor,* 519 F.2d 352, 355–56 (6th Cir. 1975); *National Right to Work Legal Defense v. Richey,* 167 U.S.App.D.C. 18, 510 F.2d 1239 (1975), *cert. denied,* 422 U.S. 1008, 95 S.Ct. 2631, 45 L.Ed.2d 671. *See also Kerr v. U. S. District Court,* 511 F.2d 192 (9th Cir. 1975), *aff'd,* 426 U.S. 394, 96 S.Ct. 2119, 48 L.Ed.2d 725; *City of Los Angeles v. Williams,* 438 F.2d 522 (9th Cir. 1971); *Gialde v. Time, Inc.,* 480 F.2d 1295 (8th Cir. 1973); *American Exp. Warehousing, Ltd. v. Transamerica Ins. Co.,* 380 F.2d 277 (2nd Cir. 1967).

**63.** *See Nixon v. Sirica,* 159 U.S.App.D.C. 58, 65–66, 487 F.2d 700, 707–708 (1973).

**64.** *See, e. g., Usery v. Ritter,* 547 F.2d 528 (10th Cir. 1977); *Pfizer, Inc. v. Lord,* 456 F.2d 545, 547–48 (8th Cir. 1972).

**65.** *See Hartley Pen Co. v. U. S. District Court,* 287 F.2d 324 (9th Cir. 1961).